**WESTINGHOUSE ELECTRIC SUPPLY CO.**
**v. NATIONAL LABOR RELATIONS BOARD.**

No. 10603.

United States Court of Appeals
Third Circuit.

Argued April 8, 1952.

Decided May 26, 1952.

John G. Wayman, Pittsburgh, Pa., Job Taylor, II, John C. Bane, Jr., John G. Wayman, Donald B. Heard, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Westinghouse Electric Supply Co., Petitioner.

Dominick L Manoli, Washington, D. C., George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Dominick L. Manoli, Nancy M. Sherman, Attys.; National Labor Relations Board, Washington, D. C., for respondent.

Albert C. Shapira, Pittsburgh, Pa., Counsel for Federation of Westinghouse Independent Salaried Unions, intervenor amicus curiae.

Before MARIS, GOODRICH and HASTIE, Circuit Judges.

MARIS, Circuit Judge.

The petitioner, Westinghouse Electric Supply Company, which we shall call the Company, asks this court to set aside an order of the National Labor Relations Board issued against it on September 26, 1951. The order was based upon the Board's finding that the Company, while engaged in collective bargaining with the Federation of Westinghouse Independent Salaried Unions, which we shall call the Union, had refused to disclose to the Union at a negotiation meeting on September 21, 1949 a chart setting forth the results of a survey which the Company had made of salary rate ranges paid for comparable employment by other employers in the area engaged in the same industry. The Board found that the refusal to disclose the information contained in the survey chart to the Union's representatives at this meeting was an unfair labor practice. Solely on the basis of this unfair labor practice it held that a strike by the Company's employees on September 29, 1949, while ostensibly called by the Union to enforce their demands for higher salary rate ranges, was in reality an unfair labor practice strike and that the Company was accordingly obligated to reinstate all the strikers who desired reinstatement. The order of the Board directed the Company to cease and desist from its unfair labor practices, to bargain collectively with the Union and to reinstate the strikers and make them whole for any loss of pay they might have suffered. 96 N.L.R.B.

It will be seen that the Board's whole case depends upon its finding that the Company refused to disclose to the Union's representatives the information contained in the survey chart in question. In making this crucial finding the Board was divided, one member vigorously dissenting. The Company strongly attacks the Board's finding as being unsupported by substantial evidence on the record considered as a whole. After examining the record we find ourselves in accord with the dissenting member of the Board and with the Company in concluding that the Board erred in making the finding.

The finding in question must, of course, be considered in the light of the whole record.[1] The record establishes and the Board found that the Company bargained in good faith with the Union, which on November 29, 1948 had been designated as the bargaining agent of the salaried employees of the Pittsburgh branch, from the first negotiation meeting on February 14, 1949 to the meeting on September 21, 1949. At the end of this period of negotiations the only issue remaining in dispute between the parties involved the Company's salary rate ranges. The Company had taken the

866, 869–70; Ford Motor Co. v. Ryan, 2 Cir., 1950, 182 F.2d 329; Nicol v. Koscinski, 6 Cir., 1951, 188 F.2d 537; Wiren v. Laws, D.C.Cir., 1951, 194 F.2d 873.

1. Universal Camera Corp. v. National Labor Relations Bd., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

position that these could not be substantially increased because to do so would place them out of line with the rate ranges of competitive employers in the area. During the period immediately preceding the meeting on September 21st, the Company had secured data from competitive employers. The Company had asked the Union to defer the September meeting until it had completed a survey of the salary rate ranges paid by its local competitors to which the Union had agreed. So the Union had reason to believe that such a survey had been made. The Company summarized the results of the survey in the chart in question.

At the bargaining session on September 21st it appears that the Company again asserted that it could not increase its existing salary rate ranges because they were equal or superior to those of its competitors. The Company's two representatives at the meeting testified that they then showed the survey chart to the Union's representatives. The latter, however, denied seeing it and asserted that they had asked the Company's representatives for proof of their assertions as to the superiority of their existing rate ranges but that such proof had not been given them.

It was on the basis of this conflicting evidence that the trial examiner, upheld by a majority of the Board, found that the Company had refused to disclose the survey chart to the Union's representatives. The trial examiner reached this conclusion largely because his study of the survey chart led him to the conclusion that it did not support the Company's position in the bargaining negotiations. Hence, he concluded, it was most likely that the Company's representatives did not disclose it.

▇ We think however, that it makes no real difference whether or not the survey chart was actually produced at the September 21st meeting. For there is no basis in the evidence for the finding that the Company *refused* to produce it since there is no evidence whatever of any request on the part of the Union's representatives for its production or the disclosure of the results of the survey. On the contrary the

Union's representatives testified merely that they demanded proof to support the Company's contention that its existing salary rate ranges were equal to or better than those of its competitors. Assuming, as the trial examiner and the majority of the Board concluded, that the survey chart did not tend to support the Company's contention but rather indicated that its salary rate ranges were on the whole lower than those of its competitors, the Company would certainly have been under no duty to produce it in answer to this demand on the part of the Union's representatives. Of course, if the Union's representatives had asked to see the results of the survey and the Company had refused to disclose them, the Board's finding that such refusal constituted an unfair labor practice might well have been justified.[2] However, as we have seen, the evidence does not support such a finding.

What we have said, we think, makes it clear that the survey chart, which in the proceedings before the trial examiner and the Board took on great importance, was regarded as of little or no significance during the bargaining negotiations themselves. Otherwise the Union's representatives would certainly have asked to see the chart or would, at least, have inquired as to the results of the survey. But the fact is clear on their own testimony that they did not do so. Moreover the chart itself was not even offered in evidence by the General Counsel for the Board at the hearing before the trial examiner. On the contrary it was offered by the Company and by it only to explain the apparent delay in the negotiations prior to September 21st. Furthermore counsel for the Board in summing up to the trial examiner the unfair practices of which he alleged the Company was guilty did not even mention the incident of the survey chart. All of the charges of unfair labor practices which counsel made at that time were subsequently found by the Board to be unfounded. It is, therefore, difficult to escape the conclusion that the alleged refusal to produce the survey chart was an afterthought by which it was hoped to save the case when all of the more serious charg-

---

2. Compare National Labor Relations Bd. v. Yawman & Erbe Mfg. Co., 2 Cir., 1951, 187 F.2d 947, 949.

es against the Company had been found to be groundless.

We conclude that the Board erred in finding that the Company had been guilty of an unfair labor practice, that as a result thereof the strike of the Company's employees which followed was an unfair labor practice strike and that it was accordingly incumbent upon the Company to reinstate all of the strikers who desire reinstatement. Accordingly the order of the Board must be set aside in its entirety.

The order of the Board will be set aside.