**18**

INTERNATIONAL UNION OF ELEC-
TRICAL, RADIO AND MACHINE
WORKERS, AFL–CIO–CLC, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Westinghouse Corporation, Intervenor.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WESTINGHOUSE ELECTRIC
CORPORATION,
Respondent,

International Union of Electrical, Radio
and Machine Workers, AFL–CIO–CLC,
Intervenors.

INTERNATIONAL UNION OF ELEC-
TRICAL, RADIO AND MACHINE
WORKERS, AFL–CIO–CLC, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

General Motors Corporation, Intervenor.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GENERAL MOTORS CORPORATION,
Respondent,

International Union of Electrical, Radio
and Machine Workers, AFL–CIO–CLC,
Intervenor.

GENERAL MOTORS CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

International Union of Electrical, Radio
and Machine Workers, AFL–CIO–CLC,
Intervenor.

WESTINGHOUSE ELECTRIC
CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

International Union of Electrical, Radio
and Machine Workers, AFL–CIO–CLC,
Intervenor.

WESTINGHOUSE ELECTRIC
CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 78–2067, 78–2262, 79–1682, 79–1892,
79–2563 and 80–1181 to 80–1183.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 28, 1980.

Decided Nov. 28, 1980.

As Modified on Rehearing Jan. 22, 1981.

20

20

Winn Newman, with whom Lawrence Gold, Richard B. Sobol, and Michael B. Trister, Washington, D. C., were on brief, for International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC as petitioner in Nos. 78–2067 and 79–1682 and intervenor in Nos. 78–2262, 79–1892, 79–2563, and 80–1181. James G. Mauro, Jr., New York City, entered an appearance for International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC.

Collis Suzanne Stocking, Atty., N.L.R.B., Washington, D. C., with whom Paul J. Spielberg, and Elliot Moore, Deputy Associate Gen. Counsels, N.L.R.B., Washington, D. C., were on brief, for the National Labor Relations Board as respondent in Nos. 78–2067, 79–1682, 79–2563, and 80–1181 through 80–1183 and petitioner in Nos. 78–2262 and 79–1892.

Peter D. Post, Pittsburgh, Pa., with whom Walter P. DeForest and Mary Helen Chiodo, Pittsburgh, Pa., were on brief, for Westinghouse Electric Corporation as intervenor in No. 78–2067, respondent in No. 78–2262, and petitioner in Nos. 80–1181 through 80–1183. Bernard J. Casey, Washington, D. C., and Robert E. Payne, Richmond, Va., entered appearances for Westinghouse Electric Corporation.

J. R. Wheatley, Detroit, Mich., of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of court, with whom Edmond J. Dilworth, Jr., Detroit, Mich., was on brief, for General Motors Corporation as intervenor in No. 79–1682, respondent in No. 79–1892, and petitioner in No. 79–2563.

Lutz Alexander Prager and Mark S. Flynn, Attys., Equal Employment Opportunity Commission, Washington, D. C., were on brief for amicus curiae Equal Employment Opportunity Commission, urging affirmance. Marilyn S. G. Urwitz, Atty., Equal Employment Opportunity Commis-

sion, Washington, D. C., entered an appearance for amicus curiae Equal Employment Opportunity Commission.

Douglas S. McDowell, Troy, Mich., was on brief for amicus curiae Equal Employment Advisory Council, urging affirmance.

Michael J. Bartlett and Charles I. Cohen, Washington, D. C., were on brief for amicus curiae Chamber of Commerce of the United States of America, urging affirmance.

John A. Fillion, M. J. Whitman, and Leonard R. Page, Detroit, Mich., were on brief for amici curiae International Union, United Automobile, Aerospace & Agricultural Implement Workers of America and National Education Association, urging affirmance in part and reversal in part.

Before WRIGHT, Chief Judge, MIKVA, Circuit Judge, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the court filed by Chief Judge MARKEY.

MARKEY, Chief Judge:

The International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC (Union) petitions for modification and enforcement of National Labor Relations Board (board) orders in these consolidated cases. The board petitions for enforcement of its orders; General Motors Corporation (GM) and Westinghouse Corporation (Westinghouse) seek denial of enforcement. We *modify* and *enforce*.[1]

### Background

#### (1) *GM*

Consolidated cases 79–1682, 79–1892, and 79–2563 arise from a dispute between GM and Union, the collective bargaining representative at five GM facilities. In July, 1973, during a scheduled renegotiation of their collective bargaining agreement, Un-

ion requested detailed information on employment and pay of women and minorities, and a list of all discrimination complaints filed against GM under state or federal laws at each facility, "to determine and analyze the population mix" with respect to the Union's nondiscrimination standards. In March of that year Union had initiated its own "detailed and comprehensive" nationwide program to combat discrimination.

In August of 1973 GM partially complied, providing tables showing the number of male and female workers at each facility and the number of minority and female employees in three skill grades.

At all times during the negotiations, charges and law suits alleging discrimination were pending between GM, Union and Union's membership. The collective bargaining agreement reached in late 1973 recognized the responsibilities of GM and Union to avoid discrimination and stated that any discrimination claim by Union members "may be taken up as a grievance."

On July 9, 1974, Union made a formal written request for detailed data on the race, sex and age of GM's workforce, and for copies of all discrimination complaints filed against GM by union members.

GM responded by furnishing a specially prepared abstract, listing 1012 complaints, identifying only the complainant's sex and race and the general subject matter of the complaint, along with listings of its 1971, 1972, and 1973 workforces by race and sex, arranged according to EEO job descriptions. Terming that information insufficient, Union demanded broader and more detailed data so that it might determine whether there was "discrimination in the promotional system."

In October 1974 and January 1975, Union renewed all prior requests, adding a request for copies of GM's Affirmative Action Plan (AAP). GM having failed to respond, Un-

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

1. Briefs *amicus curiae* were filed by the Equal Employment Advisory Council, the Equal Opportunity Commission, the Chamber of Commerce of the United States, and (jointly) the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America and the National Education Association.

ion filed the present unfair labor practice charge on April 9, 1975.

During August and September of 1975 GM offered the Workforce Analysis (WFA) portion of its 1975 AAP for each facility if Union would agree to keep that information confidential. Union accepted that information but reserved its right to seek unconditional access to the same material by other means. In November 1975 and May 1976 GM provided similar information from its 1974 and 1976 AAPs and imposed the same confidentiality requirements.

On June 29, 1979, the board held that GM had violated Sections 8(a)(1) and (5) [2] of the National Labor Relations Act by failing to provide the requested information. Finding the information set forth in paragraph 2(a) of its Order relevant, the board ordered GM to provide:

(1) A copy of Respondent's most current work force analyses contained in the affirmative action programs filed pursuant to Executive Order No. 11246 and Revised Order No. 4 of the Office of Federal Contract Compliance Programs.

(2) Copies of all charges presently on file with any Federal, state, or local agency, alleging that Respondent has discriminated because of race, color, national origin, religion, or sex, together with copies of all administrative and court decisions relevant thereto, and information as to the correct status of all such charges, provided that Respondent may delete therefrom the names of the charging parties.

(3) The number of males and females, blacks, and Spanish-surnamed persons hired, together with their job titles and classifications into which they were hired, during each month of the most recent 12-month period.

(4) The number of employees by race, sex, and Spanish surname who have less than 1-year seniority, 1–2 years' seniority, 3–4 years' seniority, 5–9 years' seniority, 10–19 years' seniority, and 20 or more years' seniority.

(5) The number of black and Spanish-surnamed employees, together with their respective job titles and classifications and their respective years of service as of the end of the year, for the most recent 12-month period, with a designation of whether these employees are on incentive or day work jobs and of their base earnings.

(6) The number of female employees, together with their job titles and classifications and years of service for the most recent 12-month period, with a designation of whether these employees are on incentive or day work jobs and their base earnings.

(7) The number of promotions or upgrades for the most recent 12-month period broken down by race, sex, and Spanish-surnamed persons, and the race, sex, and whether Spanish-surnamed for each of these upgraded employees, including a showing of the sex of all white, black, and Spanish-surnamed employees, i. e., white male, white female, black male, black female, Spanish-surnamed male, Spanish-surnamed female.[3]

Paragraph 1 of the board's Order required GM to *cease and desist* from a general refusal to supply information relevant to possible discrimination. Paragraphs 2(b) and 2(c) of the Order required posting of notices and notification to the board's regional director of steps taken in compliance with the Order.

2. These sections, enacted as 29 U.S.C. § 158(a)(1) (1976) and 29 U.S.C. § 158(a)(5) (1976), read as follows:

§ 158. *Unfair labor practices*
(a) *Unfair labor practices by employer*
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . .
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

3. With minor semantic changes, the quoted paragraph 2(a) of the Order is a copy of the Union demand made upon GM.

## (2) *Westinghouse*

Consolidated cases 78–2067, 78–2262, 80–1181, 80–1182, and 80–1183 arise from a dispute between Westinghouse and Union, the exclusive collective bargaining representative at forty Westinghouse facilities covered since 1950 by a series of national collective bargaining agreements containing a nondiscrimination clause respecting race, creed, color and national origin. The agreements were amended in 1966 to prohibit sexual discrimination and again in 1970 to prohibit age discrimination.

In June 1972, Union asked Westinghouse for statistics on female, black and Spanish-surnamed employees by grade, wage scale and job classification, for similar data on persons hired or promoted during 1971, and for copies of all pending discrimination complaints.

Westinghouse supplied a large amount of information, including specially prepared lists of retirements, deaths, age distribution, average earnings, incentive multipliers, benefits and labor grade distribution. Westinghouse thereafter furnished data on the number of male and female employees in each labor grade at certain plants. Union continued to request data for all plants it represented, and in February and June of 1974, filed two suits against Westinghouse under Title VII, basing those suits on the statistics furnished by Westinghouse.

On June 11, 1974, Union asked Westinghouse for substantially the same information it had requested from GM. When Westinghouse rejected that request, Union said it needed the information to properly police the antidiscrimination provisions of the collective bargaining agreement. Westinghouse did not provide the information, and Union filed the present unfair labor practices charge on August 13, 1974.

In April and June of 1975, Union requested copies of Westinghouse's current AAP and WFA. Refusing that request, Westinghouse offered extensive employee data if Union would agree to keep it confidential. When Union replied that it would examine the offered data to determine whether it substantially disclosed the information requested, but would not agree to the confidentiality condition, Westinghouse declined to supply the data.

On October 31, 1978, ruling that Westinghouse had violated Sections 8(a)(1) and (5) of the National Labor Relations Act by failing to provide the requested information, the board ordered Westinghouse, in paragraph 2(a) of its order, to provide:

(1) The number of male and female employees, blacks, and Spanish-surnamed employees at each labor grade.

(2) The number of employees by race, sex, and Spanish surname in each classification in the bargaining unit and the wage for each classification.

(3) The number of employees by race, sex, and Spanish surname in each classification in each plant who are paid on a daywork basis and who are paid on an incentive basis.

(4) The number of employees by race, sex, and Spanish surname who have less than 1 year's seniority, 1–2 years' seniority, 3–4 years' seniority, 5–9 years' seniority, 10–19 years' seniority, and 20 or more years' seniority.

(5) The number of persons hired in each classification during the 12-month period immediately preceding the effective date of the information covered in items 1 through 4 above, or such other 12-month period as may be mutually agreed upon by the parties with a breakdown as to sex, race, and Spanish surnames, showing the sex of all black and Spanish-surnamed persons.

(6) The number of promotions or upgrades for the same 12-month period, broken down by race, sex, and Spanish-surnamed persons showing the job level of each upgraded employee prior to and subsequent to each such upgrade and the race, sex, and whether Spanish-surnamed for each of these upgraded employees.

(7) A list of all complaints and charges filed against Respondent under the Equal Pay Act, Title VII of the Civil

Rights Act of 1964, Executive Order 11246, and state fair employment practices laws relating to IUE-represented units, and copies of each complaint or charge relating to employees in IUE-represented units, along with any related documents pertaining to the status of such charges, provided that Respondent may delete therefrom the names of the charging parties.

(8) Copies of the most recent work force analyses filed under Executive Order 11246 and Revised Order 4 of the Office of Federal Contract Compliance Programs for or covering each plant or location covered by the IUE-Westinghouse national agreement; provided that Respondent may delete therefrom material unrelated to items 1 through 6 above.[4]

Paragraph 1 of the board's Order required Westinghouse to cease and desist from a general refusal to supply information relevant to possible discrimination. Paragraphs 2(b) and 2(c) of the Order required posting of notices and notification to board's regional director of steps taken in compliance with the orders.

### Issues

The basic issue is whether the board's conclusion, that refusal to supply the requested data constituted an unfair labor practice under the statute, is supported by substantial evidence. That issue may be broken down for treatment in the form of four sub-questions, i. e., whether the board erred in ordering: (1) provision of data on distribution and advancement of women and minorities; (2) provision of copies of discrimination complaints filed by Union-represented employees; (3) provision of por-

**4.** With minor semantic changes, the quoted paragraph 2(a) of the Order is a copy of the Union demand made upon Westinghouse.

**5.** The briefs reflect concern over whether a union's established *right* to seek out evidence of discrimination and negotiate for its elimination might here be converted into a *duty* to do so. We do not reach that issue in this case and express no view concerning it.

tions of the employers' most recent WFAs; and (4) that copies of the employers' entire AAPs need not be provided.

### OPINION

**(1) *Data on Distribution/Advancement of Women and Minorities***

The board held that data showing the distribution and recent advancements of women and minority employees must be supplied because it is presumptively relevant to the Union's collective bargaining duties. Both GM and Westinghouse challenge that holding, arguing that the doctrine of presumptive relevance has never been so broadly construed.

■ Courts have held that certain information is so intrinsic to the core of the employer-employee relationship as to be presumptively relevant, a view initially stated in *Whitin Machine Works*, 108 NLRB 1536, 1541 (1954), *enforcement granted*, 217 F.2d 593 (4th Cir. 1954), *cert. denied*, 349 U.S. 905, 75 S.Ct. 583, 99 L.Ed. 1242 (1955), in which the board had held individual employee wage data to be presumptively relevant to collective bargaining. The presumptive relevance approach has been expanded to include other types of wage-related information, names and addresses of employees, and information on fringe benefits. In essence, the approach begins with some duty owed by a union in the representation of its members and evaluates requested information on its relevance to that union's ability to carry out that duty. We affirm that approach.[5]

■ The present collective bargaining agreements contain long-standing provisions aimed specifically at elimination of discrimination against women and minori-

Similarly, we need not in this case resolve the parties' other contentions, not relevant here, concerning the breadth and meaning of the phrase "presumptively relevant", the requested information here being clearly relevant under the circumstances of this case. *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 153, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956).

ties.[6] In contrast to *International Union of Electrical, Radio and Machine Workers v. NLRB (White Farm)*, —— F.2d —— (D.C. Cir.1980), decided of even date, the Union's bargaining representatives (the Conference Board) here themselves engaged in extensive bargaining over many years on the very subject and in an attempt to gain the requested information. The information was sought not merely as part of some general internal program of the union, and not merely by some union official divorced from the bargaining process. The information was here sought by bargaining representatives, as part of the bargaining process, to which the information related, and the information would assist those representatives in carrying out their duty of determining whether the anti-discrimination clauses of the agreements were being violated.[7]

■ "The elimination of discrimination and its vestiges is an appropriate subject of bargaining, and an employer may have no objection to incorporating into a collective agreement the substance of his obligation not to discriminate in personnel decisions . . . ." *Emporium Capwell Co. v. Western Addition Community Org.*, 420 U.S. 50, 69, 95 S.Ct. 977, 988, 43 L.Ed.2d 12 (1975). Once anti-discrimination clauses like those in the present agreements become part of a collective bargaining agreement, it becomes the duty of union representatives engaged in bargaining and in monitoring the agreement to see to it that an employer meets its obligations under those clauses. Here Un-

ion's bargaining representatives were doing just that, and the employer's duty to bargain in good faith under Section 8(a)(5) included the duty to supply requested information needed to enable the union representatives to properly negotiate and perform their agreement-created duties under the anti-discrimination clauses. *See e. g., Detroit Edison Co. v. NLRB*, 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979); *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–568, 17 L.Ed.2d 495 (1967). Hence the requested information was in these cases relevant to that union duty and failure to supply the women and minority employee data requested was a violation of Section 8(a)(1) and (5) of the Act.

■ GM and Westinghouse say they need not supply data intended for use in Union-sponsored litigation against them. But whether the requested information might prove useful in litigation is irrelevant in determining whether there is a duty under the collective bargaining agreement to supply the information. The Supreme Court, in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), stated "In sum, Title VII's purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." *Id.* at 49.[8] So here, there is no basis for application of an "election of remedies" approach.[9]

---

**6.** Elimination of discrimination is a mandatory subject when raised on either side of the collective bargaining table, *Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 64, 95 S.Ct. 977, 985, 43 (1975); *Vaca v. Sipes*, 396 U.S. 903 (1967); *Jubilee Manufacturing Company*, 202 NLRB 272, 273 (1973), aff'd 504 F.2d 271 (D.C.Cir.1974); *Farmers' Cooperative Compress*, 169 NLRB 290, 295–298 (1968), enf'd on this ground *sub nom*, 416 F.2d 1126 (D.C.Cir.), *cert. denied*, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *United Packinghouse Workers v. N.L.R.B.*, 416 F.2d 1126 (D.C.Cir.), *cert. denied*, 396 U.S. 903, 90 S.Ct. 216, 24 L.Ed.2d 179 (1969); *Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers of America, AFL–CIO (Busi-*

*ness League of Gadsden)*, 150 NLRB 321, 322 (1964), enf'd 368 F.2d 12 (5th Cir. 1966).

**7.** Nothing of record supports the argument that Union ever waived or intended to waive any right to the requested information.

**8.** An interpretive memorandum introduced by a sponsor of the Civil Rights Act states, "If a given action should violate both Title VII and the National Labor Relations Act, the National Labor Relations Board would not be deprived of jurisdiction." 110 Cong.Rec. 7207 (1964).

**9.** Respecting the overlap of remedies in the labor relations field, *see NLRB v. C. & C. Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17

■ It is argued that the Union's present request for information is a kind of "back door" effort to obtain information for use in litigation that might not be obtainable under the discovery rules. Again, the argument would appear irrelevant on two grounds. First, if there be suppliable information that should be supplied and that evidences invidious discrimination in violation of a labor agreement, it can hardly be broadly said that an employer may bind a union to keep any and all of that information out of litigation, or that a union may properly accede to any such limitation. Second, the trial court has broad discretion to control the actual use of information in the litigation and may be relied upon to prevent unfairness.

■ GM and Westinghouse next posit a substantial burden, in time and money, required to meet the Union's request for data on women and minority employees. Those factors are not irrelevant and must be considered at the compliance stage, but as bases for initially refusing to supply the requested data they are in this case unpersuasive.

As the board pointed out, both employers are subject to various Federal regulations and Executive Orders. The primary regulation, 41 CFR 60–2.11(a), requires employers to maintain detailed statistical data concerning their workplaces. 41 CFR 60–2.23 requires composition of workforce data by minority group status, sex, and promotional patterns. Presumably, GM and Westinghouse have complied with those regulations, and at least the bulk if not all of the requested data is already available.[10]

The record is unclear respecting the informational format of Union's demands upon both employers. There is some indication that Union has not insisted on a particular data format, as long as it is given access to the data in useable form. In fairness and practicality, no reason appears for requiring an employer to recast all of its data into a particular, union-designed format, if, as is presumably the case, the information is supplied in a format useable under Federal regulations. In all events, given a continuation of good will in these cases on both sides, the duty to supply the data having been here confirmed, the parties should be able to reach a mutually satisfactory mode of compliance.

The board's finding of a violation in the refusal to supply data on women and minority employees being supported by substantial evidence, paragraphs 1, 2(a)(3)–(7), 2(b) and 2(c) of its Order in the GM case and paragraphs 1, 2(a)(1)–(6), 2(b) and 2(c) of its Order in the Westinghouse case are ordered enforced.

### (2) Discrimination Complaints

The board ordered GM and Westinghouse to provide Union with copies, with names deleted, of all discrimination complaints filed by Union-represented employees, considering the information contained in the complaints relevant because it could assist Union in identifying areas of discrimination.

■ We agree that information regarding the type and frequency of complaints filed by its members is relevant to Union's function as bargaining representative of those members. We do not agree, however, that actual copies of the complaints must or should be provided. Nor do we agree that actual copies are necessary to provide the required information.

L.Ed.2d 486 (1967); *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 272, 84 S.Ct. 401, 409, 11 L.Ed.2d 320 (1964); including remedies for discrimination, *see United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 2728, 61 L.Ed.2d 480 (1979); *Emporium Capwell*, 420 U.S. at 66, 95 S.Ct. at 986; *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48–49, 94 S.Ct. 1011, 1019–1020, 39 L.Ed.2d 147 (1974).

10. It is argued that some information was not available when demanded in 1974, and that no violation can be found in refusal to supply it at that time. But Union's requests were ongoing, as were the refusals, continuing to the present day. If there were in fact no violation in 1974, no useful purpose would be served in requiring the filing of unfair labor practice charges for each of the intervening years.

In permitting deletion of complainants' names, the board attempted a recognition of the privacy interests involved. The mere deletion of complainant names, however, does not sufficiently insure the confidentiality of their complaints. In many instances a reading of the complaint would allow one familiar with the work environment to identify the complainant.

▉ That employees have a privacy interest in information regarding their competence was affirmed by the Supreme Court in *Detroit Edison v. NLRB*, 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979): "The sensitivity of any human being to disclosure of information that may be taken to bear on his or her basic competence is sufficiently well known to be an appropriate subject of judicial notice." *Id.* at 318, 99 S.Ct. at 1132. Though the Court there dealt with a request for employee scores on aptitude tests, the same concern for the privacy of the individual employee should be shown here.

Nothing here said precludes a union member from supplying his union with copies of his complaint, with or without his name deleted, or from employing the agreed grievance procedures. The Union seeks copies of complaints from the employer because the complaining union member, presumably, has elected not to involve his union. The filing of complaints would be inhibited if employees knew their complaints would be given to a local union representative or fellow union member who, in some cases, might be the very subject of the complaint.

▉ Moreover, a procedure tending to inhibit the filing of employee complaints, and thus to inhibit the social progress the complaint procedures were designed to achieve, is contrary to the congressional intent informing its establishment of those procedures. That intent is specifically set forth in Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–8(e)) and EEOC regulations (29 CFR 1601.20), prohibiting public officials from making complaints public. The board's dismissal of these provisions, merely on the ground that they do not bind private citizens, did not, in our view, pay sufficient deference to the public policy underlying those provisions. Nothing of record warrants the conclusion that a union, however much supported by the board, may force an employer to do what the law prohibits public officials from doing and thereby to nullify the protection of union member-complainants intended by that law.[11]

Accordingly, we modify paragraph 2(a)(2) of the order in the GM case, and paragraph 2(a)(7) in the Westinghouse case, to require delivery to Union not of actual copies of complaints but of a compilation of the numbers, types, dates and alleged bases of complaints filed. That information will enable Union to ascertain the possible existence of discrimination, without so individualizing the information as to undermine the required assurance to union members that their complaints will be maintained in confidence.

Paragraph 2(a)(2) of the Order in the GM case and paragraph 2(a)(7) in the Westinghouse case are modified and enforced as modified.

### (3) *Workforce Analyses (WFA)*

GM and Westinghouse argue that the board was without jurisdiction to order provision of the WFA section of their AAP's because failure to provide them was not found a violation of Section 8(a)(1) or (5).

▉ The board found that GM and Westinghouse had violated Sections 8(a)(1) and (5) in refusing to provide the statistical data on women and minority employees discussed under subquestion (1) *supra*. Its Or-

---

11. The Equal Employment Opportunity Commission's *amicus* brief reflects a surprisingly cavalier disregard for the confidentiality interests of individual union members, saying for example that "we see great merit in the [Union's] claim that it needs the names of the charging party," that the union member could request anonymity under EEOC procedures, and equating the right of the charger and chargee to disclose to an asserted right of a union to force them to do so.

der required provision of only that part of the WFAs corresponding to the data required in paragraphs 2(a)(3)–(7) of the GM Order and paragraphs 2(a)(1)–(6) of the Westinghouse Order.[12] Hence the board's order relating to WFAs requires delivery of the same information, albeit in another format, as that the refusal of which was found a violation. Jurisdiction to issue that order was therefore present under the broad remedial powers of the board. A formal finding of a violation in refusing to supply the required portion of the WFAs would have been preferable, but its absence in this case forms no basis for reversal of that part of the board's order.

We direct enforcement of the board's order that GM and Westinghouse provide Union with that part of their most current workforce analyses corresponding to the data required under paragraphs 2(a)(3)–(7) and 2(a)(1)–(6) of their respective orders.

### (4) Affirmative Action Plans (AAP)

 Union says the board erred in not ordering the provision of copies of the employers' entire AAPs, arguing that it must review the entire AAPs to enable it to determine whether the companies have undertaken commitments inconsistent with the collective bargaining agreement. We agree with the board that speculation does not establish relevance.

 Unless an employer's bargaining stance makes the information relevant, *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), it is not normally a union's duty to challenge the employers' future plans, goals, or commitments reflected in AAPs. Should GM or Westinghouse embark on a course of

conduct violative of the existing agreement, Union has several fully adequate remedies available. The interest a union might have in an employer's AAPs must be balanced with the desirability of confidential, frank self-analysis on the part of the employer. An employer's self-analysis, often including admissions and desirably candid self-criticism, is necessarily chilled by a foreknowledge that the results of that analysis must be disclosed to the union representing its employees and might then be disclosed to its competitors and others if the union sues the employer or otherwise elects to publicize the analysis.

Because the board found the AAPs not relevant to collective bargaining here it did not, and we do not, address GM's and Westinghouse's argument that the AAPs contain confidential information and trade secrets.

We affirm the Board's holding that GM and Westinghouse need not provide their AAPs to Union.

### Summary

That portion of the board's Order set forth in paragraphs 1, 2(a)(1), 2(a)(3)–7, 2(b) and 2(c) in the GM case and in paragraphs 1, 2(a)(1)–6, 2(a)(8), 2(b) and 2(c) in the Westinghouse case is enforced.

That portion of the board's Order set forth in paragraph 2(a)(2) in the GM case and paragraph 2(a)(7) in the Westinghouse case, as modified herein, is enforced.

The board's refusal to order delivery of GM's and Westinghouse's entire AAPs is affirmed.

### Modified and enforced.

---

12. Though paragraph 2(a)(1) of the board's order in the GM case requires submission of the entire WFA, the board in its opinion stated that GM may delete data not required under paragraphs 2(a)(3)–(7). GM says the order is vague in its relation to WFA data it earlier submitted. We think the order plain, however, in requiring GM to supply that portion of its *current* WFA after deleting data unrelated to that required by paragraphs 2(a)(3)–(7) of the Order. That GM had supplied earlier WFAs does not preclude the board from finding a violation where, as

here, GM is insisting that it is and was not obligated to do so. Moreover, Union's requests for information were continuous, as were its representation duties under the labor agreement. Similarly, the duty of GM and Westinghouse to meet the proper requests of Union for information is ongoing. We hold only that the board's orders to supply those portions of current WFAs corresponding to data required in the listed paragraphs of the Orders was proper in these cases.