650 F.2d 334
 105 L.R.R.M. (BNA) 3344, 24 Fair Empl.Prac.Cas. 634,
24 Empl. Prac. Dec. P 31,377, 209 U.S.App.D.C. 1,
90 Lab.Cas. P 12,400
 INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE
WORKERS, AFL-CIO-CLC, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
White Farm Equipment Company, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
WHITE FARM EQUIPMENT COMPANY, a Subsidiary of White Motor
Corporation, Respondent,
International Union of Electrical, Radio and Machine
Workers, AFL-CIO-CLC, Intervenor.
WHITE FARM EQUIPMENT COMPANY, a Subsidiary of White Motor
Corporation, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Union of Electrical, Radio and Machine
Workers, AFL-CIO-CLC, Intervenor.
 79-1654, 79-1864 and 79-2562.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 28, 1980.
Decided Nov. 28, 1980.
 
 Winn Newman, Washington, D. C., with whom Richard B. Sobol and Michael B. Trister, Washington, D. C., were on brief, for International Union of Electrical, Radio and Machine Workers, AFL-CIO-CLC as petitioner in No. 79-1654 and intervenor in Nos. 79-1864 and 79-2562.
 Collis Suzanne Stocking, Atty., N. L. R. B., Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., was on brief, for N. L. R. B. as respondent in Nos. 79-1654 and 79-2562 and petitioner in No. 79-1864.
 Peter D. Post, Pittsburgh, Pa., with whom Laurence Gold, Washington, D. C., Walter P. DeForest, and Mary Helen Chiodo, Pittsburgh, Pa., were on brief, for White Farm Equipment Company as intervenor in No. 79-1654, respondent in No. 79-1864, and petitioner in No. 79-2562. Edith E. Holiday entered an appearance for White Farm Equipment Company.
 Lutz Alexander Prager and Mark S. Flynn, Attys., Equal Employment Opportunity Commission, Washington, D. C., were on brief, for amicus curiae E. E. O. C., urging affirmance. Marilyn S. G. Urwitz, Atty., E. E. O. C., Washington, D. C., entered an appearance for amicus curiae E. E. O. C.
 John A. Fillion, M. Jay Whitman, and Leonard R. Page, Detroit, Mich., were on brief, for amici curiae International Union, United Automobile, Aerospace & Agricultural Implement Workers of America and National Education Association, urging affirmance in part and reversal in part.
 Michael J. Bartlett and Charles I. Cohen, Washington, D. C., were on brief, for amicus curiae Chamber of Commerce of the United States of America, urging affirmance.
 Before WRIGHT, Chief Judge, MIKVA, Circuit Judge, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.
 ORDER
 PER CURIAM.
 
 
 1
 These causes came on to be heard on petitions for review and cross-application for enforcement of an order of the National Labor Relations Board and were argued by counsel. While the issues presented occasion no need for an opinion, they have been accorded full consideration by the court. See Local Rule 13(c).
 
 
 2
 The order of the National Labor Relations Board is supported by substantial evidence in the record taken as a whole. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Moreover, this court finds that the Board's order is otherwise free from reversible legal error.
 
 
 3
 On consideration of the foregoing, generally for the reasons stated in the Board's order, it is ORDERED and ADJUDGED by this court that the petitions for review are hereby denied and the cross-application for enforcement is hereby granted.
 
 
 4
 MARKEY, Chief Judge, dissents from the foregoing order for the reasons stated in the following dissenting opinion.
 
 MARKEY, Chief Judge, dissenting:
 
 5
 With all due respect, I dissent. Lacking willingness, expertise, and legal authority to engage in what I view as legislation, I am unable to join in affirming the board's action in this case. That an employer can be held in violation of a duty to bargain, for refusing to supply information, when the information and the source of the request are entirely outside the collective bargaining process, is to me a result grotesque.[1] I can find no basis in law for such result. Though courts are on occasion forced to "make" law, I cannot join in what appears to me an unnecessary exercise of that power. Nor can I concur in a result I view as damaging to the collective bargaining process. I would, for the reasons outlined below, modify the board's order.[2]
 
 Background
 
 6
 White operates a warehouse and parts depot in Columbus, Ohio with about twelve employees. In June, 1971, White and Union negotiated a collective bargaining agreement covering the period August 15, 1971-August 15, 1974. Union was recognized as the exclusive representative for "employees," defined as "all Warehousemen, Shipping and Receiving employees."[3] The agreement gave the Union no rights with respect to hiring. On the contrary, it expressly provided that hiring was a management prerogative.[4] The agreement contained a broad antidiscrimination provision.[5]
 
 
 7
 In March, 1973, Union initiated its own national antidiscrimination or, in its words, "race and sex" program, and began gathering information throughout the country. On June 28, 1974, Union attorney Ronald Janetzke requested White to provide: (1) the number of job applicants, by race and sex, after January 1, 1973; (2) the number hired each month, by race and sex, after January 1, 1973; and (3) copies of summary booklets and master insurance agreements between White and its insurance carriers for White's medical, sickness, accident, and life insurance plans. The request was said to be based on the Union's desire to "analyze plant practices which may not be spelled out in the collective bargaining agreement, which practices may be in conflict with Title VII of the Civil Rights Act of 1964."
 
 
 8
 On July 10, 1974, twelve days after Janetzke's request, White and Union began collective bargaining toward renewal of their existing agreement. Attorney Janetzke took no part whatever in the bargaining. The negotiators for Union were one representative of the International and a number of representatives of the Union's Local 745. The Union negotiators did not seek to bargain over any alleged sex or race discrimination issues; nor did they seek information of the kind requested by Janetzke.
 
 
 9
 Collective bargaining resulted in an agreement effective August 15, 1974 August 13, 1977. As in its predecessor, Union was recognized as the exclusive representative for employees; hiring was recognized as a management prerogative; and there was an antidiscrimination provision.[6] Union obtained increased benefits under White's benefit plans, the benefits being described in an attachment to the agreement. White retained the prerogative of determining the manner of financing and providing benefits. Union negotiators made no allegations during bargaining that any of White's benefits were discriminatory.
 
 
 10
 On August 8, 1974, attorney Janetzke repeated his request to White for information. On August 19, 1974, White explained that the requested information about job applicants was unavailable, because its employment application forms did not record race and no such tabulation had ever been made. White informed Janetzke that three employees had been hired after January 1, 1973, and that the present bargaining unit consisted of eleven white males and one black male. White provided a booklet describing its insurance plans and benefits, but did not provide its master insurance agreements.
 
 
 11
 On August 29, 1974, Janetzke asked for a tabulation of persons who had applied at the Columbus facility or, alternatively, copies of all job applications received after January 1, 1973, and repeated his request for White's master insurance agreements, stating a belief that certain provisions thereof were discriminatory on the basis of sex. Also, Janetzke asked White to "advise why there are not any female employees and why employment is limited to one black." In conclusion, Janetzke asked whether White would be willing to meet with him concerning these matters.
 
 
 12
 By letter to Janetzke dated September 18, 1974, White declined to furnish the requested information about applicant and hiring activity because "the Union has no responsibility or accountability" therefor under the terms of the collective bargaining agreement. White also declined to furnish master insurance agreements, because
 
 
 13
 Our contractual commitment with the Union is one of providing negotiated benefits. The manner in which we do so is a prerogative which we have thus far reserved we can select from insurance carriers, or could establish a trust fund, or could simply self-insure. The master policies to which you refer not only involve the one location in which you are interested but contain information applicable to other Company locations as well.
 
 
 14
 White then gave a detailed explanation why its benefit plans were not discriminatory on the basis of sex, and concluded that "if the Union wants benefit coverage altered, bargaining demands should be presented and costs considered at the appropriate time."
 
 Proceedings
 
 15
 On October 4, 1974, Union filed an unfair labor practice charge with the board, alleging that White's refusal to furnish Janetzke with the requested information was a breach of its duty to bargain collectively. The board issued a complaint on December 12, 1974, alleging that White had violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (Act).[7]
 
 
 16
 After an evidentiary hearing, the Administrative Law Judge (ALJ) issued a decision on May 30, 1975, holding that White had not violated the Act. The ALJ found it significant that Union negotiators at no time during the 1974 negotiations sought the information requested by Janetzke. Not only, said the ALJ, did Union negotiators make no claim of need for that information for any purpose, but they bargained an entire new agreement without raising any issue of discrimination with respect to fringe benefits or hiring practices. Accordingly, the ALJ dismissed the charge.
 
 
 17
 Contrary to the ALJ, the board held that the failure of Union negotiators to put forth Janetzke's information request did not mean that the information was not relevant to collective bargaining. Rather, said the board, "the most that can be inferred from the Union's action is that the advantages of a contract in hand outweigh those which the Union might later obtain when all relevant information would be available to it."
 
 
 18
 According to the board, the only issue is whether the requested information is relevant to the Union's proper performance of its duties as bargaining representative. The board answered in the affirmative. With respect to applicant and hiring information, the board held that this requested information is presumptively relevant, because "an employer's hiring practices inherently affect terms and conditions of employment." The board held that copies of master insurance agreements, insofar as they pertain to unit employees, are presumptively relevant to the Union's policing and administration of the collective bargaining agreement. According to the board, White did not effectively rebut the presumption of relevancy, which the board applied to both types of information.
 
 
 19
 By order dated June 22, 1979, the board held that White's refusal to provide the information requested by Janetzke, on race and sex of applicants for employment, race and sex of those hired, and copies of master insurance agreements constituted an unfair labor practice within the meaning of Sections 8(a)(1) and 8(a)(5) of the Act. The board required White to cease and desist from that refusal, but held that White need not provide its reasons for not hiring more female and black employees.
 
 The Issues Presented
 
 20
 The basic issue is whether the board's finding that White's refusal to provide the information requested by Janetzke constituted an unfair labor practice under the statute is supported by substantial evidence. Sub-issues presented on this appeal are whether information on the race and sex of applicants for employment and of those hired, and copies of master insurance agreements between White and its insurance carriers, were relevant to collective bargaining in this case, and whether White had a statutory obligation to explain why more female and black employees had not been hired.
 
 OPINION
 
 21
 It is well settled that an employer has a statutory obligation to provide a union's bargaining representatives with requested information that will enable them to perform their duties as representative of the union members. NLRB v. Acme Industrial Co., 385 U.S. 432, 435-36, 87 S.Ct. 565, 567-568, 17 L.Ed.2d 495 (1967); Local 13, Detroit Newspaper v. NLRB, 598 F.2d 267, 271 (D.C.Cir.1979); San Diego Newspaper Guild v. NLRB, 548 F.2d 863, 866 (9th Cir. 1977). But the union's bargaining representatives are strangers to this litigation.
 
 
 22
 The board erred in glossing over the source of the request, and in applying a quasi per se and overbroad definition of relevance. Both errors are discussed in this opinion.
 
 
 23
 As stated in Emeryville Research Center, Shell Dev. Co. v. NLRB, 441 F.2d 880, 883 (9th Cir. 1971), "The first question in such a case is always one of relevance. If the information requested has no relevance to any legitimate union collective bargaining need, a refusal to furnish it could not be an unfair labor practice."
 
 
 24
 Moreover, the question is not whether requested information is abstractly or theoretically relevant to the performance of a union's statutory duties, but whether it is actually relevant under "the circumstances of the particular case." NLRB v. Truitt Mfg. Co., 351 U.S. 149, 153, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956). To reach its result here, the board found it necessary to disregard those guidelines found in Emeryville and Truitt.
 
 Applicant and Hiring Information
 
 25
 Making no reference to the source of the present request, Union simply asserts that the requested information on race and sex of applicants for employment, and the race and sex of those hired, was relevant to collective bargaining. Discrimination in hiring, says the Union, vitally affects the interests of unit employees because it is inherently detrimental to the terms and conditions of their employment; the Union is legitimately concerned that unit employees have an integrated work environment, and nondiscriminatory hiring is a prerequisite to preserving such an environment.
 
 
 26
 Because, says the Union, urging White to adopt a nondiscriminatory hiring policy relates to a fundamental condition of employment, it concludes that it was entitled to bargain with White over the issue of discrimination in hiring and that the requested information was therefore relevant to that issue. We need not decide whether the Union was so entitled, for Union's negotiators never bargained with White over the issue of discrimination in hiring. And that is true, even though Janetzke's request pre-dated the opening of collective bargaining on renewal of the agreement. Attorney Janetzke did not in any manner participate in negotiation of the 1974-1977 collective bargaining agreement. Throughout negotiations, no Union representative ever raised the issue of discriminatory hiring policies or sought information of the kind requested by Janetzke. Indeed, the record does not indicate that Union's negotiators ever wanted to bargain about any aspect of the hiring process.
 
 
 27
 On the contrary, the 1974-1977 agreement (like its predecessor) expressly recognized that hiring was a management prerogative. Hiring was the sole responsibility of White and there was no hiring-related provision in the agreement for Union to administer. One aspect of grotesqueness here is the board and court-sanctioned whip-sawing of an employer who bargains in good faith with some union representatives to obtain an agreement provision, and is then promptly held a violator for refusing to disregard that provision at the request of a different and non-bargaining union representative. That "catch 22" operation hardly facilitates the collective bargaining process.
 
 
 28
 If Union wanted information it believed relevant to collective bargaining, it was incumbent upon Union's negotiators, as a first step, to request that information from White at the bargaining table. See Westinghouse Electric Supply Co. v. NLRB, 196 F.2d 1012, 1014 (3rd Cir. 1952). That the negotiators, to the contrary, agreed that hiring was management's prerogative is highly probative evidence that the race and sex information requested by Janetzke was not relevant to collective bargaining in this case. Otherwise stated, White was under no obligation to furnish information in response to requests made by Janetzke away from the bargaining table, when such requests were not forthcoming at the table and Union's actions there indicated that the information was not relevant. Nor was White, in my view, obligated to effectively nullify the hiring provision of its agreement upon the request of Janetzke.
 
 Master Insurance Agreements
 
 29
 During negotiations in 1974, Union's negotiators neither asked for master insurance agreements nor raised any issue of discrimination with respect to fringe benefits. Nevertheless, Union now urges that it must have access to details in the master policies to police and administer the collective bargaining agreement. I cannot agree.
 
 
 30
 White contracted to provide negotiated benefits, which it has faithfully done. The benefits are described in detail in Schedule "B" of the 1974-1977 agreement. The manner of financing and providing benefits, however, was specifically recognized as White's prerogative, and White chose to exercise that prerogative by selecting particular insurance carriers. Contrary to Union's position, therefore, the master policies are outside the scope of the agreement. And, once again, the nullifying of White's good faith agreement, by the board's order and its affirmance here, makes a charade of the collective bargaining process.
 
 
 31
 It is not disputed that insurance and related fringe benefits for unit employees are mandatory subjects of collective bargaining, Allied Chemical and Alkali Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. 157, 159, 92 S.Ct. 383, 387, 30 L.Ed.2d 341 (1971); Inland Steel Co. v. NLRB, 170 F.2d 247, 251 (7th Cir. 1948), cert. denied, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949), because employee benefits are a form of compensation within the meaning of "wages" or "other terms and conditions of employment" in the Act. See W. W. Cross & Co. v. NLRB, 174 F.2d 875, 877-78 (1st Cir. 1949); Inland Steel Co. v. NLRB, 170 F.2d at 251.
 
 
 32
 An employer thus has a statutory obligation to bargain over the type and level of benefits received by employees under a collective bargaining agreement. White did just that during negotiation of the 1974-1977 agreement, when Union negotiated increased benefits provided by White's various fringe benefit plans. A description of negotiated benefits was attached to the agreement (Schedule "B") and also provided to Union in booklet form.
 
 
 33
 An employer is not, however, required to bargain over the manner of supplying benefits. In Connecticut Light & Power Co. v. NLRB, 476 F.2d 1079 (2d Cir. 1973), the court held that the company did not violate its obligation to bargain collectively by refusing to negotiate the selection of the carrier for its employee medical-surgical benefits plan. The company fulfilled its statutory duty, said the court, by bargaining over coverage, benefits and administration of the plan (cf. Bastian-Blessing, Division of Golconda Corp. v. NLRB, 474 F.2d 49, 54 (6th Cir. 1973), where it was impossible to separate the carrier from the benefits).
 
 
 34
 Here, similar to Connecticut Light & Power Co., White had no obligation to bargain over the manner of financing and providing negotiated benefits. Union does not contend that White failed to negotiate the coverage, benefits, or administration of its various plans. Having negotiated these matters, White was free to finance and to provide the benefits in any manner it chose, a prerogative which it reserved in bargaining. The master agreements between White and its insurance carrier, being outside the scope of the 1974-1977 collective bargaining agreement, are not relevant to the negotiation or administration of that agreement.
 
 Union's Request for Reasons
 
 35
 As previously stated, hiring policies and procedures were not within Union's province under the 1974-1977 collective bargaining agreement, and Union had no responsibility or accountability therefor. Accordingly, I agree with the board that White had no statutory duty to respond to Janetzke's question about why there were no females and only one black among its twelve employees.
 
 Presumptive Relevance
 
 36
 The courts have held that certain types of information, for example, wage data on employees in the bargaining unit, are so intrinsic to the core of the employer-employee relationship as to be presumptively relevant. Emeryville Research Center, Shell Dev. Co. v. NLRB, 441 F.2d at 887; Curtiss-Wright Corp., Wright Aero Div. v. NLRB, 347 F.2d 61, 69 (3rd Cir. 1965). Unless the presumption is rebutted, an employer must provide that information. Conversely, when a union requests information not ordinarily pertinent to its performance as bargaining representative, but alleged to have become pertinent because of peculiar circumstances, the union has the burden to prove relevance before the employer must comply. San Diego Newspaper Guild v. NLRB, 548 F.2d 863, 867 (9th Cir. 1977). Unlike the situation relating to information on women and minority employees in International Union of Electrical, Radio and Machine Workers v. NLRB (Westinghouse and General Motors), 648 F.2d 18 (D.C.Cir.1980), decided of even date, the union here has not shown the requested information relevant to any collective bargaining process.
 
 
 37
 By characterizing applicant and hiring data and copies of master insurance agreements as presumptively relevant, the board placed the burden of proof on White to show that information not relevant to collective bargaining. In so doing, the board ignored the evidence before it and stretched the doctrine of presumptive relevance beyond its breaking point. As the courts have said, where the request is for information concerning employees outside of the bargaining unit, the union must show that the requested information is relevant to bargainable issues. San Diego Newspaper Guild v. NLRB, 548 F.2d at 867-68, and cases cited therein.
 
 
 38
 Under the board's approach, it is difficult to imagine how any information could be considered not presumptively relevant. If the test is met by information concerning applicants outside of the bargaining unit,[8] and concerning master insurance policies outside the scope of collective bargaining, then virtually any requested information would fall within the "presumptively relevant" rubric.
 
 
 39
 It is an overbroad interpretation of the Act that requires submission to all requests from any union source for all information on everything that might possibly bear in any manner at any time upon any aspect of the employment relationship, or that may possibly be raised at some time in any future bargaining session. To apply, as the board did here, that interpretation to requests entirely outside, and in conflict with the results of, the collective bargaining process, is to render the Act a comedic farce.
 
 
 40
 The Union's laudable and commendable antidiscrimination program cannot automatically render any and all information the Union's attorney thinks might relate to that program presumptively relevant to every collective bargaining session, past, present, and future. Nor should Union's election to create such a "program" give birth to a requirement in law that every employer with whom it deals must account to the Union's attorney on the employer's compliance with the attorney's view of what he called "Title VII of the Civil Rights Act of 1964". More simply stated, the evidence before the board failed to support the finding of a violation in failure to supply the Union's attorney with the information he requested.
 
 Mid-Term Negotiations
 
 41
 Union says Janetzke requested information to engage in "mid-term negotiations," referring to the inquiry about a meeting in Janetzke's August 29, 1974 letter. The argument lacks merit.
 
 
 42
 Janetzke's letter gave no indication that Union was seeking information for the purpose of negotiating a 1978-80 contract. If Union wanted to renegotiate the recently renewed contract, that was precluded by the Act. The parties agreed that hiring was management's prerogative, and negotiated increased insurance benefits, in the renewed collective bargaining agreement covering August 15, 1974-August 13, 1977. Under Section 8(d) of the Act, 29 U.S.C. § 158(d), the obligation to bargain collectively "shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract." The purpose of Section 8(d) is to give stability to agreements governing industrial relations, see NLRB v. Jacobs Mfg. Co., 196 F.2d 680, 684 (2d Cir. 1952). Accordingly, because Union negotiated and signed the 1974-1977 agreement, it was precluded from "mid-term negotiations" on hiring and benefits absent a willingness by White to negotiate. See NLRB v. Raven Industries, Inc., 508 F.2d 1289, 1292 (8th Cir. 1974).
 
 
 43
 Moreover, the evidence refutes the notion that Union wanted to engage in collective bargaining negotiations after execution of the 1974-1977 agreement, and destroys as well the board's gratuitous conjecture that the Union's negotiators were victims of a "half-a-loaf" mentality. Janetzke's letter nowhere indicates that Union wanted to bargain or negotiate, and White hardly would have inferred as much, having just completed two months of bargaining to reach the 1974-1977 agreement. Janetzke's letter was part of Union's continuing effort, contemporaneous with but apart from negotiations, to obtain information for its internal antidiscrimination program. Further, the contract provided that "(d)uring the term of this Agreement, in the event the parties agree to add to or subtract from any provision of this contract, the Company will negotiate with the President of I.U.E. Local 745 and/or the International Representative, and the duly elected stewards for the bargaining unit."[9] None of those listed officials ever approached White about mid-term bargaining, and Janetzke was not one of the listed officials. It thus strains credulity to say that Janetzke was attempting to engage in mid-term collective bargaining negotiations in his letter of August 29, 1974.[10]
 
 Conclusion
 
 44
 I would hold that White owed no duty to meet any request of Janetzke, that the requested information about the race and sex of applicants for employment and of those hired, and copies of master insurance agreements, were not relevant to collective bargaining in this case; and that White did not have a statutory obligation to tell Janetzke why more female and black employees had not been hired. I would hold the board's finding that White violated Sections 8(a)(1) and 8(a)(5) of the Act unsupported by substantial evidence.
 
 
 45
 Accordingly, I would deny enforcement of the board's order concerning the applicant, hiring, and insurance information, and would affirm the board's holding that White did not violate the Act by refusing to provide reasons why more females and blacks had not been hired.[11]
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a)(1976)
 
 
 [1]
 The request came from a union attorney. The rationale employed by the board and affirmed by the majority would be equally applicable, however, to requests from a clerk at the union's headquarters, the attorney and clerk being equally divorced from the collective bargaining process in this case
 
 
 [2]
 242 NLRB No. 201 (1979)
 
 
 [3]
 Article 1, section 2 of the 1971-1974 agreement
 
 
 [4]
 "The Union recognizes Management's right to manage the plant and the business of the Company and to direct the working forces, including the right to lay off for lack of work, hire, retire, transfer, promote, suspend, or discharge for just cause, subject to the provisions of this Agreement." Article 15
 
 
 [5]
 "Neither the Company nor the Union shall discriminate in any manner whatsoever against any employee because of race, sex, political or religious affiliation, nationality, marital status, or membership or non-membership in any labor or other lawful organization." Article 16
 
 
 [6]
 Articles 1, 2, and 16 of the 1974-1977 agreement
 
 
 [7]
 These sections, enacted as 29 U.S.C. § 158(a)(1) (1976) and 29 U.S.C. § 158(a)(5) (1976), read as follows:
 § 158. Unfair labor practices
 (a) Unfair labor practices by employer
 It shall be an unfair labor practice for an employer
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.
 Section 7, 29 U.S.C. § 157 (1976), reads:
 § 157. Right of employees as to organization, collective bargaining, etc.
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
 Section 8(d), 29 U.S.C. § 158(d) (1976), reads in pertinent part:
 § 158. Unfair labor practices
 (d) Obligation to bargain collectively
 For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession
 
 
 [8]
 The bargaining representative has no right to inject itself into the hiring process, absent a contract provision, the union's duty of representation extending only to unit employees. See Allied Chemical and Alkali Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. at 181 n.20, 92 S.Ct. at 398 n.20 (1971); Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). The antidiscrimination clause of the present agreement related only to employees. Union represents employees, not applicants
 
 
 [9]
 Article 3, section 2(a) of the 1974-1977 agreement
 
 
 [10]
 The letter was part of Union's own antidiscrimination program. Elimination of discrimination in employment is a goal so desirable that efforts of all should be welcomed. The more banner carriers the better. However, it is not a statutory function of the board, nor is it within the power of a union outside the collective bargaining process, to ensure compliance with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (1976), enforcement having been entrusted by Congress to the EEOC. 42 U.S.C. §§ 2000e-4 & e-5 (1976). If unions are to share that enforcement burden, it is for the Congress, not the courts, to say
 A practical effect of the board's present decision to be avoided is the imposition of new obligations on unions to search for discrimination against applicants. The board's present decision would create new rights for unions to review company records outside the bargaining process. But rights erect corresponding responsibilities to exercise those rights, and vulnerability of unions to lawsuits alleging failures adequately to meet those responsibilities. See Vaca v. Sipes, 386 U.S. at 177, 87 S.Ct. at 909; International Union of Electrical, Radio and Machine Workers v. NLRB (Westinghouse and General Motors), 648 F.2d 18 (D.C.Cir.1980) (decided of even date); Local Union No. 12, United Rubber, Cork, Linoleum & Plastic Workers of America v. NLRB, 368 F.2d 12, 17-18 (5th Cir. 1966).
 
 
 [11]
 Briefs amicus curiae were filed by the Equal Employment Advisory Council, the Equal Employment Opportunity Commission, the Chamber of Commerce of the United States, and (jointly) the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America and the National Education Association