OIL, CHEMICAL & ATOMIC WORKERS LOCAL UNION NO. 6-418, AFL-CIO; Oil, Chemical & Atomic Workers Local Union No. 6-75, AFL-CIO, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Minnesota Mining and Manufacturing Co., Intervenor.

INTERNATIONAL CHEMICAL WORKERS UNION LOCAL NO. 733, AFL-CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Borden Chemical, A Division of Borden, Inc., Intervenor.

OIL, CHEMICAL & ATOMIC WORKERS INTERNATIONAL UNION, KANSAS CITY, LOCAL NO. 5-114, AFL-CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Colgate-Palmolive Company, Intervenor.

BORDEN CHEMICAL, A DIVISION OF BORDEN, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

International Chemical Workers Union, Local No. 733, AFL-CIO, Intervenor.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MINNESOTA MINING AND MANUFACTURING COMPANY, Respondent,

Oil, Chemical & Atomic Workers Local Union No. 6-418, AFL-CIO, et al., Intervenors.

COLGATE-PALMOLIVE COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Oil, Chemical & Atomic Workers International Union, Kansas City, Local No. 5-114, AFL-CIO, Intervenor.

Nos. 82-1418 to 82-1420, 82-1743, 82-1589 and 82-1940.

United States Court of Appeals, District of Columbia Circuit.

Argued May 5, 1983.

Decided June 30, 1983.

George H. Cohen, with whom Laurence Gold, Washington, D.C., was on brief, for petitioners, Oil, Chemical and Atomic Workers, Local Union No. 6–418, AFL–CIO, et al.

George J. Tichy, II, San Francisco, Cal., with whom Robert K. Carrol, San Francisco, Cal., for petitioner, Borden Chemical, A Division of Borden, Inc.

Howard A. Crawford, with whom Jack D. Rowe, Kansas City, Mo., was on brief, for petitioner and intervenor, Colgate-Palmolive Co. G. William Frick, Washington, D.C., also entered an appearance for intervenor Colgate-Palmolive Co. in No. 82–1420.

Thomas M. Vogt, with whom Nelson E. Schmidt, St. Paul, Minn., was on brief, for intervenor and respondent, Minnesota Mining and Mfg. Co.

Collis Suzanne Stocking, Atty., N.L.R.B., with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., was on brief, for petitioner and respondent, N.L.R.B. Elinor Hadley Stillman, Atty., N.L.R.B., Washington, D.C., entered an appearance for respondent in Nos. 82–1419 and 82–1743.

Before WILKEY and EDWARDS, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

These consolidated petitions for review and applications for enforcement involve three decisions of the National Labor Relations Board ("NLRB" or "Board") in cases dealing with requests by unions for information concerning the health and safety of employees represented by the bargaining agents. In each instance, the company was found to have violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("NLRA" or "Act")[1] by failing to provide the unions with information, other than data constituting trade secrets or individually identifiable medical records, relevant to the health and safety of the employees.

Two of the employers, Colgate-Palmolive Company ("Colgate") and Borden Chemical ("Borden") have petitioned for review of the decisions adverse to them; in both of these cases, the NLRB has cross-applied for enforcement. The third employer, Minnesota Mining and Manufacturing Company ("3M"), did not petition for review, but is resisting the NLRB's application for enforcement. Notwithstanding this minor procedural difference, the challenges presented by the three employers overlap in a number of important respects. Each company argues that the requested information is not relevant to the unions' bargaining responsibilities and that, in any

1. 29 U.S.C. § 158(a)(1) & (5) (1976).

event, the inclusion of proprietary and trade secret data within the scope of the unions' requests for information legitimated the employers' refusal to comply with those requests. The employers, alone or in combination, also raise a number of other defenses premised, for example, on allegations pertaining to the confidentiality of employees' medical records, the burdensomeness of the unions' requests, and the unions' waivers of their right to receive relevant information. We find no merit in any of these contentions.

The Board's decisions are attacked, from a different angle, by two locals of the Oil, Chemical & Atomic Workers International Union ("International") and one affiliated with the International Chemical Workers Union ("ICWU"). The unions, while satisfied with most aspects of the NLRB's decisions, argue that the Board ignored its statutory obligation to resolve unfair labor practice charges[2] in failing to decide whether the employers' refusal to supply relevant information containing trade secrets violated the NLRA. We disagree. In our view, the Board's decisions, fairly read, reveal clearly its conclusion that the companies had not been shown to have contravened the Act by declining unconditionally to disclose the small part of the requested information constituting proprietary or trade secret material. As the Board found, however, the employers failed to satisfy their bargaining obligations concerning this information by wholly denying its relevance; accordingly, we approve the orders requiring them to bargain in good faith with the unions over the conditions under which trade secret information might appropriately be disclosed.

**2.** *See* 29 U.S.C. § 160(c) (1976).

**3.** Agreement Between 3M, Cottage Grove, Minnesota and Local No. 6–418 (Aug. 30, 1976), *reprinted in* 3M Appendix 240–41.

**4.** Letter from Donald Buck, President, Local 6–418, to Bernie Curti, Personnel Manager, Chemolite Plant (Oct. 27, 1977), *reprinted in* 3M Appendix 237.

## I. Background

### A. *Minnesota Mining and Manufacturing Company: Nos. 82–1418 & 82–1589*

At issue in these petitions for review is the bargaining relationship—successfully maintained for over twenty-five years—between 3M and Local 6–418, the exclusive representative of a unit of employees at 3M's Chemolite plant in Cottage Grove, Minnesota. The employees represented by Local 6–418, the NLRB properly concluded, are regularly exposed to a wide range of hazardous or potentially hazardous substances and conditions, and employee health and safety have long been acknowledged by 3M to be legitimate and appropriate subjects of collective bargaining. Thus, the relevant collective bargaining agreement contains an extensive health and safety provision that, in addition to imposing various obligations on 3M, requires Local 6–418 to take an active role in promoting the health and safety of employees at the Chemolite plant.[3]

The events underlying the unfair labor practice charge against 3M commenced in 1977 when the International, increasingly concerned about health and safety problems affecting its members, instituted a nationwide program to aid its locals in investigating potentially hazardous working conditions. On October 27, 1977, in response to advice from the International, a representative of Local 6–418 requested health and safety information pertaining to employees at 3M's Chemolite plant to enable the union to "carry out its representation responsibilities under the collective bargaining agreement."[4] Among the data requested were morbidity and mortality statistics for past and present employees, generic names of all substances used or produced at the plant, results of clinical and laboratory studies of

It is, in our view, irrelevant that the request for information was made in response to a suggestion by the International and conformed to a sample letter distributed by the International. As long as the information sought relates to a union's bargaining responsibilities, the request is legitimate.

employees undertaken by 3M, results of studies of toxic agents to which employees may be exposed, health information derived from insurance and workmen's compensation claims, a list of contaminants monitored by 3M, a description of 3M's hearing conservation program, and data on employees' exposure to radiation and heat. Subsequent events and testimony by representatives of the union made clear, and the NLRB properly found, that the request did not seek disclosure of individually identified medical records. In submitting its request, moreover, Local 6–418 disclaimed any intention to circumscribe "the format under which the company may choose to answer" and emphasized that "any . . . written form convenient for the company" would be acceptable to it.[5]

3M never responded to Local 6–418's request in writing, but the vague position communicated to the union shortly after the submission of the request crystallized at a meeting of company and union representatives on March 24, 1978. After representatives of Local 6–418 had explained the reasoning underlying their request, 3M indicated that it would not supply any of the information specified in the union's letter. In short, 3M claimed that (1) it kept no morbidity or mortality statistics, (2) the list of generic names would not aid the union and might reveal trade secrets, and (3) medical records could be supplied only to an individual's personal physician pursuant to a request by the employee or the physician.[6] 3M supplemented these specific responses with generalized contentions that its health and safety programs were adequate and that Local 6–418 should rely on the company to safeguard its employees' health and safety.

The NLRB found that 3M's refusal to comply with the union's request violated sections 8(a)(1) and 8(a)(5) of the NLRA to the extent that the requested material did not include either trade secrets or individually identified medical records. The Board began its analysis by approving, in large measure, the Administrative Law Judge's ("ALJ") conclusions regarding the threshold question of relevance.[7] Read together, the opinions of the ALJ and the NLRB indicate that the requested information was found relevant to Local 6–418's representational responsibilities because (1) employees at the Chemolite plant are exposed to many real and potential dangers, (2) the contract between the parties evinces genuine concern for employees' health and safety on both sides and obligates both 3M and Local 6–418 to act to protect health and safety, and (3) the viewpoints of the union and the company concerning the extent to which employees are endangered and the appropriate responses to workplace hazards inevitably will diverge from time to time. Under the particular facts of this case, the Board found, the union's "need for the information requested is not merely speculative." *Minnesota Mining & Manufacturing Co.*, 261 N.L.R.B. No. 2, at 10 (Apr. 9, 1982). On the contrary, "Local 6–418 can hardly be expected to bargain effectively regarding health and safety matters if it, unlike [3M], knows neither those substances to which the unit employees are exposed nor previously identified health problems resulting therefrom." *Id.* at 11.

---

**5.** *Id.* at 239.

**6.** Although 3M's personnel manager apparently questioned the scope of the union's request in an informal discussion with a union representative, Transcript of June 15, 1978 Hearing Before Administrative Law Judge, *reprinted in* 3M Appendix 50 (testimony of Donald Buck), the NLRB found that the company had never properly raised issues concerning the costliness and burdensomeness of compliance with the request. *Minnesota Mining & Mfg. Co.*, 261 N.L.R.B. No. 2, at 17 n. 23 (Apr. 9, 1982). This failure alone is probably sufficient to defeat 3M's belated claim that Local 6–418's request was overly burdensome, for "[i]f the company does wish to assert that a request for information is too burdensome, this must be done at the time the information is requested and not for the first time during the unfair labor practice proceeding." R. GORMAN, BASIC TEXT ON LABOR LAW 417 (1976); *see J.I. Case Co. v. NLRB*, 253 F.2d 149, 156 (7th Cir.1958).

**7.** *See Minnesota Mining & Mfg. Co.*, Case No. 18–CA–5710, at 10–13 (Mar. 13, 1979) (Mullin, A.L.J.), *reprinted in* 3M Appendix 295, 304–07.

As the NLRB recognized, this conclusion did not end its inquiry; it remained necessary to balance the union's need for relevant information against any legitimate and substantial confidentiality interests asserted by the employer. *See Detroit Edison Co. v. NLRB,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979). 3M alleged two such interests. The first, resting on the need to protect the confidentiality of individual medical records, was rejected because Local 6–418 had not sought individually identified medical data and the minimal intrusion that would attend the provision of aggregate data and individual records from which identifying data have been excised could not counterbalance the union's need for relevant health information.

3M also asserted a need to protect the confidentiality of its trade secrets. This interest, the NLRB found, was implicated by the disclosure of only a miniscule fraction of the generic names of raw materials sought by Local 6–418. 3M's failure unconditionally to disclose those few generic names that did constitute trade secrets, the Board implicitly held, did not amount to an unfair labor practice. But the Board found that the company had improperly maintained that the requested information was wholly irrelevant, thereby precluding bargaining over the possibility that disclosure might be made in a manner that would accommodate the legitimate interests of both labor and management. In remedying this violation, the NLRB concluded that it need not "engage in the full balancing of countervailing rights discussed by the Supreme Court in *Detroit Edison* . . . before first affording [the] parties an opportunity to reach an accommodation on their own.

They would be in the best position to develop necessary methods and devices for the information exchange through the traditional collective-bargaining mechanism." 261 N.L.R.B. No. 2, at 19 (footnote omitted).

The Board's order thus required the release of all requested information except individual medical records from which identifying data have not been deleted and the names of substances constituting trade secrets, and it obligated 3M to bargain concerning the trade secret information.

**B. *Colgate-Palmolive Company: Nos. 82–1420 & 82–1940***

■ These petitions for review interject this court into the longstanding and generally amicable bargaining relationship between Colgate and Local 5–114, the exclusive representative of a unit of production and maintenance employees at the company's plant in Kansas City, Kansas. The employees represented by Local 5–114, the NLRB properly found, are exposed to a wide range of potentially hazardous substances, and Colgate has acknowledged that employee health and safety are legitimate and appropriate subjects of collective bargaining. Thus, the collective bargaining agreement between Colgate and Local 5–114—negotiated in 1976 without a request for health and safety information [8]—contains a provision that imposes health and safety obligations on both the company and the union.[9]

On November 16, 1977, Local 5–114, following the instructions of the International,[10] submitted a written request for health and safety information pertaining to employees at Colgate's Kansas City plant. This request, like the one presented to 3M

---

**8.** Local 5–114's failure to make such a request during contract negotiations, Colgate argues, constitutes a waiver of any right it might have had to receive the information sought in these proceedings. But it is well established that the statutory right to receive information may be relinquished only by a "clear and unmistakable" waiver, *Procter & Gamble Mfg. Co. v. NLRB,* 603 F.2d 1310, 1318 (8th Cir.1979); *J.I. Case Co. v. NLRB,* 253 F.2d at 154, and that silence in the bargaining agreement is insufficient to constitute such a waiver, *Federal Compress & Warehouse Co. v. NLRB,* 398 F.2d 631,

636 (6th Cir.1968); *see George Banta Co., Banta Div. v. NLRB,* 686 F.2d 10, 20 (D.C.Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983). Accordingly, we hold that Local 5–114 did not waive its right of access to relevant information by remaining silent on this issue during the 1976 negotiations.

**9.** *See* Colgate Joint Appendix 204–05.

**10.** *See* note 4 *supra* and accompanying text.

by Local 6–418, was designed to enable the union properly to "carry out its representation responsibilities under the collective bargaining agreement." [11] In all material respects, Local 5–114's request was identical to the request served on 3M; in particular, Local 5–114's letter emphasized that the union would accept the information in any form convenient to Colgate. As in the companion case, moreover, subsequent events and testimony by union representatives made clear, and the NLRB properly found, that Local 5–114 was not seeking disclosure of individually identified medical records.

In the months following the submission of the union's request, the parties held several meetings at which Colgate consistently took the position that it was not obligated to furnish any of the specified information. On February 24, 1978, for example, the manager of the Kansas City plant met with union representatives and indicated that he could not provide the information requested "since it would be a tremendous burden on the Company to attempt to collect such data and ... [the] request appears to be more of a fishing expedition than a specific question on a safety or health problem at the Kansas City Plant." Colgate Joint Appendix 208. This negative response was reiterated in writing on May 10, 1978; [12] shortly thereafter, Local 5–114 filed the unfair labor practice charge under consideration herein.

As in the companion case involving 3M, the NLRB found that Colgate's refusal to furnish information violated sections 8(a)(1) and 8(a)(5) of the NLRA to the extent that the requested material did not include either trade secrets or individually identified medical records. The Board commenced its

analysis by approving the ALJ's resolution of the relevance issue. Read together, the opinions of the ALJ and the NLRB indicate that the requested information was found relevant to Local 5–114's representational responsibilities because (1) employees at the Kansas City plant are exposed to potentially hazardous substances, (2) health and safety are terms and conditions of employment over which these parties have bargained, (3) the contract between the parties obligates both Colgate and Local 5–114 to act to protect employees' health and safety, and (4) the contractual health and safety provisions would be rendered meaningless if Colgate could permissibly refuse the union's request for information. As the ALJ observed,

> occupational illness or disease resulting from extended exposure to chemicals or environmental conditions in the workplace is, by its nature, exceedingly difficult to diagnose, and without proper information such as requested by the Union, and a subsequent thorough analysis of such information undertaken by individuals with expertise in such matters, the contractual provisions purportedly designed to protect employees from unsafe jobs would be rendered, in significant part, illusory.

*Colgate-Palmolive Co.,* Case No. 17–CA–8331, at 10 (Mar. 27, 1979) (Wacknov, A.L. J.), *reprinted in* Colgate Joint Appendix 214, 223.

The Board then considered the countervailing interests counseling nondisclosure of the relevant health and safety information; in most respects, its treatment of these interests paralleled its disposition of the arguments raised by 3M.[13] Thus, the

---

11. Letter from Ronnie Wilkinson, Recording Secretary, Local 5–114, to David R. Voysey, Plant Manager (Nov. 16, 1977), *reprinted in* Colgate Joint Appendix 206.

12. Letter from David R. Voysey, Plant Manager, to Orville Kuran, President, Local 5–114 (May 10, 1978), *reprinted in* Colgate Joint Appendix 209.

13. The Board believed that Colgate's estimates of the amount of time and money required to

retrieve the information requested by Local 5–114 were exaggerated. The company's burdensomeness argument was rejected, however, primarily because Colgate

> at no time attempted to reduce the burden of accumulation by seeking clarification of the request or by apprising the Union of the extensiveness or availability of the information sought as a guide for simplifying or limiting its demand. Nor did [Colgate] suggest that the Union might assist in the cost of retrieval.

NLRB concluded that Local 5–114 had not requested individually identified medical records, and that "the Union's need for medical data potentially revealing past effects of the workplace environment upon those whom it represents outweighs any minimal intrusion upon employee privacy implicit in the supplying of aggregate data." *Colgate-Palmolive Co.,* 261 N.L.R.B. No. 7, at 15 (Apr. 9, 1982). The Board also approved the ALJ's determination that Colgate had not violated the Act by refusing unconditionally to disclose those few generic names that constituted trade secrets; it found, however, that Colgate, like 3M, had failed to bargain over conditions under which such information might be provided to the union. This transgression, the Board concluded, did not necessitate a disclosure order, but could appropriately be remedied by requiring the company to engage in good faith bargaining over "acceptable methods of furnishing [trade secret] information while maintaining satisfactory safeguards to preserve confidentiality." *Id.* at 17 (footnote omitted).[14]

The order entered by the Board against Colgate was identical in all material respects to the one imposed on 3M.

C. *Borden Chemical: Nos. 82–1419 & 82–1743*

The final petitions for review put in issue the bargaining relationship between Borden and Local 733, the representative of a unit of production and maintenance employees at Borden's plant in Fremont, California. The record reveals, and the ALJ properly found, that the employees represented by Local 733 are regularly required to work with a wide variety of hazardous or potentially hazardous materials. Borden's highly commendable efforts to reduce or eliminate the hazards inherent in its business demonstrate clearly that the protection of employees' health and safety at the Fremont plant is a serious concern, and the company and the union understandably have recognized the propriety of bargaining over these efforts. As a result of negotiations in 1976, Borden is contractually obligated to make "all reasonable provisions for the safety and health of its employees," and the union is required to participate in a joint Labor-Management Health and Safety Committee that considers, among other things, "the natures of substances used in the plant, and the safe limitations on exposure."[15]

◼ In April 1976, in preparation for the negotiations that led to the 1976 agreement, a representative of the ICWU requested that Borden provide certain information—including a list of the generic and trade names of all materials and chemicals handled by union members—in order that the union might "bargain intelligently on wages, hours, and other working conditions."[16] Although it largely complied with the union's request, Borden did not prepare or provide the requested list of materials and chemicals. The company's position with respect to this list developed in bits and pieces during negotiations in May 1976. In essence, Borden's representatives contended that (1) the requested list would not help the union resolve specific health and safety problems, (2) the company's commitment to discuss particular health and safety

*Colgate-Palmolive Co.,* 261 N.L.R.B. No. 7, at 11 (Apr. 9, 1982).

**14.** In the Board's view, it could legitimately postpone a full balancing of countervailing rights because

[t]he parties have enjoyed a satisfactory collective-bargaining relationship over many years and there is nothing to indicate that the instant controversy cannot be resolved to their mutual satisfaction. Obviously, they are in the best position to develop necessary methods and devices under which needed information may be furnished to the Union while maintaining appropriate safeguards to

protect [Colgate's] legitimate proprietary interests.

*Id.* at 17–18 (footnote omitted).

**15.** Agreement Between Borden Chemical, Fremont, California and Local No. 733, art. XVIII, General Counsel's Exhibit 3, *reprinted in* Borden Joint Appendix, vol. 3.

**16.** Letter from Arthur G. Wood, Vice President, Region 9, ICWU, to O.A. Sandberg, Plant Manager, Borden Chemical (Apr. 1, 1976), Respondent's Exhibit 10, *reprinted in* Borden Joint Appendix, vol. 3.

problems on an individual basis obviated the need for a list of substances used in the plant, and (3) the list, if it existed, could not be released because it would reveal proprietary information. Borden never acceded to the union's request, the matter of the list was pushed aside, and the parties eventually agreed upon a health and safety provision proposed by the company.[17]

In March 1977, the union renewed its request for a list of the raw materials used at the Fremont plant. This request was repeated and rebuffed, both orally and in writing, on several occasions during April 1977. On November 1, 1977, the Health and Safety Committee noted the pendency of the union's request, and a representative of the ICWU again reiterated the union's need for a list of raw materials. On November 10, 1977, the request was finally and definitively rejected on the ground that the list in question contained confidential, proprietary, trade secret information. The parties communicated no further on this subject, and the proceeding that has culminated in these petitions for review commenced on November 22, 1977, when the union filed its unfair labor practice charge.[18]

The NLRB concluded, on these facts, that Borden had violated sections 8(a)(1) and 8(a)(5) of the NLRA by refusing to provide the names of raw materials and chemicals—other than those constituting trade secrets—used in the Fremont plant. On the crucial question whether the requested data were relevant to the union's representational functions, the Board adopted the reasoning set forth in the ALJ's decision. That reasoning, while couched in the language of

---

**17.** This bargaining history and the terms of the parties' agreement, Borden believes, require a conclusion that the union waived its right to receive a list of substances used in the plant. In the company's view, the parties resolved the issue at the bargaining table, and the Board is not empowered to disturb the bargain struck there. But, on the facts at hand, no inference can be drawn that the union ever conceded that it no longer considered the requested list relevant to its representational responsibilities. *See* note 8 *supra*. *See also White Farm Equip. Co.,* 242 N.L.R.B. 1373, 1374 (1979) ("That the Union subsequently executed a new collective-bargaining agreement without the benefit of Respondent's prior disclosure of the information requested does not establish that the information was not relevant.... 'The most that can be inferred from the Union's action is that the advantages of a contract in hand outweigh those which the Union might later obtain when all relevant information would be available to it.'") (quoting *NLRB v. Yawman & Erbe Mfg. Co.,* 187 F.2d 947, 949 (2d Cir.1951)), *enforced sub nom. International Union of Elec., Radio & Mach. Workers v. NLRB,* 650 F.2d 334 (D.C. Cir.1980) (per curiam).

**18.** In Borden's view, the charge was time-barred by the six-month limitations period established by § 10(b) of the NLRA, 29 U.S.C. § 160(b) (1976). However, the request for a list of substances was renewed in November 1977 both by Local 733's representatives on the Health and Safety Committee and by a representative of the ICWU. The company's attempt to distinguish the request made by Local 733 from that made by the ICWU is, under the circumstances of this case, unpersuasive. Bor-

den's final decision to deny the longstanding request was not communicated to the union until November 10, 1977, and the unfair labor practice charge—filed on November 22—was well within the statutory period. *See also J. Ray McDermott & Co. v. NLRB,* 571 F.2d 850, 858 (5th Cir.) ("each refusal to bargain ... is a violation of the employer's duty, and ... the passage of more than six months' time from one such refusal does not bar action by the NLRB on a timely complaint based on a subsequent refusal"), *cert. denied,* 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978).

Borden also contends that the union was required to submit its request for information to the contractual grievance mechanism before filing an unfair labor practice charge. The ALJ properly rejected this claim. As the Third Circuit has observed,

> unless the collective bargaining agreement both contains a broad disclosure provision and the grievance and arbitration provisions are also couched most broadly, clearly indicating that demands for information are to be made through the grievance and arbitration machinery, the existence of such machinery is no defense to an employer who has refused to supply relevant data upon a union request.

*Curtiss-Wright Corp., Wright Aeronautical Div. v. NLRB,* 347 F.2d 61, 71 (3d Cir.1965); *see C–B Buick v. NLRB,* 506 F.2d 1086, 1095 n. 18 (3d Cir.1974). Here, as in *Curtiss-Wright,* "the right to the requested data stems from the Act ... rather than from the collective bargaining agreement"; accordingly, Borden "cannot demand that the Union use the grievance machinery as its method of data accumulation." 347 F.2d at 72.

"presumptive relevance,"[19] makes clear that the placement of the initial burden of production was not dispositive and that the requested information was found relevant under the particular facts of this case. Thus, we glean from the ALJ's opinion the observations that (1) employees at the Fremont plant are required to handle and process potentially hazardous chemicals and raw materials, (2) the plant's employees have increasingly become concerned regarding the risks posed to their health and safety by those substances, (3) the union planned to consult with "outside" experts concerning the working environment at the plant, and Borden's decision to withhold a complete materials list precluded such independent consultation, and (4) without the requested list the union could not question or verify the efficacy of Borden's safety program and thus could not police the company's compliance with its contractual obligations.[20]

After approving the ALJ's finding of relevance, the NLRB rejected his treatment of Borden's trade secrets defense. In the Board's view, the company's failure to disclose information constituting trade secrets did not violate the NLRA, but management's refusal to acknowledge the relevance of the requested list had precluded meaningful bargaining over the "conditions under which the needed information may be furnished to the Union with appropriate safeguards protective of [Borden's] proprietary interests." *Borden Chemical, A Division of Borden, Inc.,* 261 N.L.R.B. No. 6, at 6 (Apr. 9, 1982) (footnote omitted). While the NLRB recognized that it ultimately might be required to balance the competing interests of the company and the union, it concluded that "first allowing these parties

an opportunity to adjust their differences best effectuates the [NLRA] policy of maintaining industrial peace through the resolution of disputes by resort to the collective-bargaining process." *Id.* at 7 (footnote omitted).

As it had done in the two companion cases, therefore, the Board ordered Borden to supply Local 733 with the nonproprietary information and to bargain in good faith regarding those few names that might reveal its trade secrets.

## II. DISCUSSION

### A. *General Principles*

■ The disposition of these petitions for review does not require the development of any novel legal principles. An employer's duty to bargain in good faith with a labor organization representing its employees has long been acknowledged to include a duty to supply a union with "requested information that will enable [the union] to negotiate effectively and to perform properly its other duties as bargaining representative."[21] This fundamental obligation to furnish relevant information is "rooted in recognition that union access to such information can often prevent conflicts which hamper collective bargaining,"[22] and it undoubtedly extends to data requested in order properly to administer and police a collective bargaining agreement as well as to requests advanced to facilitate the negotiation of such contracts.[23] In either instance, the employer's duty is predicated on the need of the union for information that will

---

19. *See* note 26 *infra* and accompanying text.

20. *Borden Chem., A Div. of Borden, Inc.,* Case No. 32–CA–551, at 16–23 (Apr. 25, 1979) (Miller, A.L.J.), *reprinted in* Borden Joint Appendix, vol. 1.

21. *Local 13, Detroit Newspaper Printing & Graphic Communications Union v. NLRB,* 598 F.2d 267, 271 (D.C.Cir.1979) (footnote omitted); *see Detroit Edison Co. v. NLRB,* 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979);

*NLRB v. Acme Indus. Co.,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967).

22. *Florida Steel Corp. v. NLRB,* 601 F.2d 125, 129 (4th Cir.1979).

23. *NLRB v. Acme Indus. Co.,* 385 U.S. at 435–36, 87 S.Ct. at 567–68; *Procter & Gamble Mfg. Co. v. NLRB,* 603 F.2d 1310, 1315 (8th Cir. 1979); *Western Mass. Elec. Co. v. NLRB,* 589 F.2d 42, 46 (1st Cir.1978); *J.I. Case Co. v. NLRB,* 253 F.2d 149, 153–54 (7th Cir.1958).

promote "intelligent representation of the employees."[24]

The union's need and the employer's duty depend, in all cases, on the "probability that the desired information [is] relevant, and that it [will] be of use to the union in carrying out its statutory duties and responsibilities." *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 437, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967). It is a commonplace that "[e]ach case must turn upon its particular facts," *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 153, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956) (footnote omitted),[25] but it is nevertheless also true that a dichotomy has developed between data bearing directly on mandatory bargaining subjects and other kinds of information. Information in the first category, pertaining to wages, hours or conditions of employment, is *presumptively* relevant, and must be disclosed unless the employer proves a lack of relevance. On the other hand, when information not ordinarily pertinent to collective bargaining, such as information concerning nonunit employees, is requested by a union, relevance is not assumed. Instead the union must affirmatively demonstrate relevance to bargainable issues.

*Press Democrat Publishing Co. v. NLRB*, 629 F.2d 1320, 1324 (9th Cir.1980) (citations omitted) (emphasis in original).[26]

The use of a presumption of relevance, of course, may substantially simplify the assessment of a union's request for information.[27] But, when seeking information to which the presumption does not apply, a union "need not demonstrate that the information ... is certainly relevant or clearly dispositive of the basic ... issues between the parties. The fact that the information is of probable or potential relevance is sufficient to give rise to an obligation ... to provide it."[28] Under this "discovery-type standard," *NLRB v. Acme Industrial Co.*, 385 U.S. at 437, 87 S.Ct. at

**24.** *Westinghouse Elec. Corp.*, 239 N.L.R.B. 106, 107 (1978) (footnote omitted), *modified on other grounds sub nom. International Union of Elec., Radio & Mach. Workers v. NLRB*, 648 F.2d 18 (D.C.Cir.1980); *see Soule Glass & Glazing Co. v. NLRB*, 652 F.2d 1055, 1092 (1st Cir.1981); *Local 13, Detroit Newspaper Printing & Graphic Communications Union v. NLRB*, 598 F.2d at 271.

**25.** *See Detroit Edison Co. v. NLRB*, 440 U.S. at 314, 99 S.Ct. at 1130; *NLRB v. Gibraltar Indus.*, 653 F.2d 1091, 1096–97 (6th Cir.1981); *Shell Oil Co. v. NLRB*, 457 F.2d 615, 618 (9th Cir.1972).

**26.** *See NLRB v. A.S. Abell Co.*, 624 F.2d 506, 510 (4th Cir.1980); *Procter & Gamble Mfg. Co. v. NLRB*, 603 F.2d at 1315; *Local 777, Democratic Union Org. Comm. v. NLRB*, 603 F.2d 862, 888 n. 69 (D.C.Cir.1978); *Prudential Ins. Co. of America v. NLRB*, 412 F.2d 77, 84 (2d Cir.), *cert. denied*, 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969); *Curtiss-Wright Corp., Wright Aeronautical Div. v. NLRB*, 347 F.2d 61, 68–69 (3d Cir.1965).

The scope of the presumptive relevance theory is unclear. The employers' argument that the theory applies only to wage and related data finds some support in the cases. *See, e.g., Prudential Ins. Co. of America v. NLRB*, 412 F.2d at 84; *Curtiss-Wright Corp., Wright Aeronautical Div. v. NLRB*, 347 F.2d at 69. But other courts have defined the theory more broadly and have suggested that any information relating directly to a mandatory subject of bargaining is presumptively relevant. *See Equitable Gas Co. v. NLRB*, 637 F.2d 980, 993 (3d Cir.1981); *Press Democrat Publishing Co. v. NLRB*, 629 F.2d at 1324. We have previously drawn a distinction between "information ... central to the 'core of the employer-employee relationship'" and "information not ordinarily central to performance of bargaining duties." *Local 13, Detroit Newspaper Printing & Graphic Communications Union v. NLRB*, 598 F.2d at 271 n. 5. But we have not found it necessary to draw the line more precisely. While the rationale underlying the presumptive relevance rule—avoiding "potentially endless bickering ... over the specific relevance of information, the very nature of which ought to render its relevance obvious," *Emeryville Research Center, Shell Dev. Co. v. NLRB*, 441 F.2d 880, 887 (9th Cir.1971)—suggests that the theory should extend to all information directly pertaining to any mandatory subject of bargaining, we need not resolve this question to decide these cases.

**27.** The presumption, however, does not alter the ultimate standard under which relevance is determined. *Local 13, Detroit Newspaper Printing & Graphic Communications Union v. NLRB*, 598 F.2d at 271 n. 5; *Prudential Ins. Co. of America v. NLRB*, 412 F.2d at 84.

**28.** *Westinghouse Elec. Corp.*, 239 N.L.R.B. at 107 (footnote omitted).

568,[29] " 'relevant' is synonymous with 'germane' "[30] and, in the absence of some valid countervailing interest, an employer must disclose information requested by a union as long as that information has a bearing on the bargaining process. *Local 13, Detroit Newspaper Printing & Graphic Communications Union v. NLRB,* 598 F.2d 267, 271–72 (D.C.Cir.1979).

 The application of this standard is, in the first instance, a matter for the NLRB, and the Board's conclusions are given great weight by the courts.[31] But a finding of relevance does not ensure that the union will receive all of the desired information in the precise form it requested. This court has long recognized that particular circumstances sometimes warrant a refusal to disclose or the imposition of conditions upon the production of requested information.[32] And the Supreme Court has clearly rejected "the proposition that union interests in arguably relevant information must always predominate over all other interests, however legitimate." *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 318, 99 S.Ct. 1123, 1132, 59 L.Ed.2d 333 (1979).

In a decision necessarily resting heavily on the facts of the particular case, the *Detroit Edison* Court concluded that the NLRB's failure adequately to protect an employer's interest in the confidentiality of its aptitude test battery and answer sheets constituted an abuse of the Board's remedi-

al authority. *Id.* at 314–17, 99 S.Ct. at 1130–32. The Court also held that the employer satisfied its bargaining obligation by offering to disclose employees' test scores only upon receipt of consents from the affected individuals. *Id.* at 317–20, 99 S.Ct. at 1132–33. In reaching these conclusions, the Court made clear that it frequently will be necessary to strike an appropriate balance between the legitimate interests of employers and unions.[33]

When applied to the decisions currently under review, we believe, these governing principles justify enforcement in full.

### B. *Relevance*

The right to relevant information, the previous section makes clear, validates requests for data reasonably necessary to enable unions effectively to administer and police collective bargaining agreements or intelligently to seek their modification. Employee health and safety indisputably are mandatory subjects of collective bargaining,[34] about which the unions in each of these cases have insisted on negotiating. The resulting contractual health and safety provisions, of course, are not set in stone and may appropriately be modified in future negotiations. In the meantime, it is "the duty of union representatives . . . to see that . . . [the employers meet their] obligations under those clauses." *International Union of Electrical, Radio & Machine*

---

**29.** *See Safeway Stores v. NLRB,* 691 F.2d 953, 956 (10th Cir.1982); *NLRB v. Associated Gen. Contractors,* 633 F.2d 766, 770 (9th Cir.1980), *cert. denied,* 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981).

**30.** 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2008 (1970).

**31.** *E.g., NLRB v. Jaggars-Chiles-Stovall, Inc.,* 639 F.2d 1344, 1347 (5th Cir.), *cert. denied,* 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 100 (1981); *NLRB v. Associated Gen. Contractors,* 633 F.2d at 770; *Procter & Gamble Mfg. Co. v. NLRB,* 603 F.2d at 1315–16; *Florida Steel Corp. v. NLRB,* 601 F.2d at 129.

**32.** *See International Union of Elec., Radio & Mach. Workers v. NLRB,* 648 F.2d 18, 26–27 (D.C.Cir.1980); *Sign & Pictorial Union Local 1175 v. NLRB,* 419 F.2d 726, 738 (D.C.Cir.

1969); *Fruit & Vegetable Packers & Warehousemen Local 760 v. NLRB,* 316 F.2d 389, 390–91 (D.C.Cir.1963).

**33.** *See also Safeway Stores v. NLRB,* 691 F.2d at 956–57; *NLRB v. Associated Gen. Contractors,* 633 F.2d at 770; *Press Democrat Publishing Co. v. NLRB,* 629 F.2d at 1326–27.

**34.** *United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1236 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); *NLRB v. Miller Brewing Co.,* 408 F.2d 12, 14 (9th Cir.1969); *NLRB v. Gulf Power Co.,* 384 F.2d 822, 824–25 (5th Cir.1967); *Winona Indus.,* 257 N.L.R.B. 695, 697 n. 9 (1981); *San Isabel Elec. Servs.,* 225 N.L.R.B. 1073, 1078 n. 6 (1976).

*Workers v. NLRB,* 648 F.2d 18, 25 (D.C.Cir. 1980).

These observations notwithstanding, the employers here argue that the unions' requests could properly be denied because (1) they were overbroad, (2) the information covered by the requests is not presumptively relevant, and (3) the unions failed to document the relevance of the requested information under the facts of these cases. The first contention is easily countered, for

> the mere fact that a Union's request encompasses information which the employer is not legally obligated to provide does not automatically excuse him from complying with the Union's request to the extent that it also encompasses information which he would be required to provide if it were the sole subject of the demand.

*Fawcett Printing Corp.,* 201 N.L.R.B. 964, 975 (1973) (footnote omitted). The companies' second claim need not be resolved to decide these cases; the NLRB does not purport to rely on the presumptive relevance theory, and our disposition of the employers' third argument renders unnecessary a full explication of the scope of the presumption. *See* note 26 *supra.*

■ That third contention, on which the outcome of this case turns, is actually an agglomeration of several tangentially related arguments. Thus, the employers claim, alone or in combination, that (1) the unions' requests were not motivated by specific problems in their respective plants, (2) the mere presence of hazardous substances or conditions within the workplace does not demonstrate the relevance of the requested information, (3) the disclosure of a list of hazardous substances or conditions would not aid the unions in performing their bargaining obligations, and (4) the companies' extensive health and safety programs ensure their employees a safe and healthy working environment. It is clear, however, that a labor organization's right to relevant information is not dependent upon the existence of some particular controversy or the need to dispose of some recognized problem. *J.I. Case Co. v. NLRB,* 253 F.2d 149, 155 (7th Cir.1958); *Westinghouse Electric Corp.,* 239 N.L.R.B. 106, 109 (1978), *modified on other grounds sub nom. International Union of Electrical, Radio & Machine Workers v. NLRB,* 648 F.2d 18 (D.C. Cir.1980). And the proposition that a union must rely on an employer's good intentions concerning the vital question of the health and safety of represented employees seems patently fallacious.

■ In cases like those now before us, where the employees admittedly are exposed to a variety of potential hazards and have expressed growing and legitimate concerns over their health and safety, where the unions explained the rationales underlying their requests in considerable detail, and where the pertinent collective bargaining agreements obligate both management and the unions to take specified actions to safeguard employees' health and safety, the relevance of a wide range of information concerning the various elements of the working environment and employees' health experiences cannot be gainsaid.[35] Under these circumstances, at least, the goals of occupational health and safety are inadequately served if employers do not fully share with unions available information on working conditions and employees' medical histories. Requiring the release of exposure and medical data in such cases will facilitate the identification of workplace hazards, promote meaningful bargaining calculated to remove or reduce those hazards, and enable unions effectively to police the performance of employers' contractual obligations as well as to carry out their own responsibilities under the respective collective bargaining agreements. As a result, we hold that the NLRB correctly assessed the relevance of the information requested in each of the cases under review.

---

**35.** Nothing in this opinion should be read to suggest that the presence of each of the factors identified herein is essential to the establishment of relevance in cases presenting similar issues.

## C. Trade Secrets

In defense of their refusal to disclose, the employers contend that some of the data encompassed within the unions' requests constitute trade secrets. As the NLRB found, however, this trade secret defense applies to only a small portion of the requested information and thus could not justify the companies' total noncompliance with the unions' requests.[36] And, while *Detroit Edison* makes clear that a union's interest in relevant information will not always outweigh an employer's legitimate and substantial interests in maintaining the confidentiality of such information, *Detroit Edison Co. v. NLRB,* 440 U.S. at 318, 99 S.Ct. at 1132, that case certainly affords no support for the proposition that an employer is absolutely privileged from revealing relevant proprietary or trade secret information. Even a cursory examination of the NLRB's decisions in these cases reveals the Board's faithfulness to the accommodative philosophy espoused by the *Detroit Edison* Court.

In each of the cases under consideration, the NLRB concluded, explicitly or implicitly, that the General Counsel had not established that the refusal to disclose trade secret information violated the NLRA. The Board held, however, that the employers' blanket denials of relevance, which it rejected, had precluded meaningful bargaining over the conditions under which this proprietary information *might* be disclosed; accordingly, the employers were ordered to bargain in good faith on this point. This position, it seems clear, fully respects the legitimacy of the companies' interests in the confidentiality of their trade secrets, for, as we read the Board's orders, they express no view on whether trade secret information ultimately need be disclosed. If conditions can be devised to accommodate both the employers' confidentiality interests and the

unions' interest in obtaining relevant information, a refusal to disclose under those conditions likely will be found to violate the Act. But if no such conditions can be created, the Board might be forced to sanction the companies' refusal to disclose trade secret information.[37]

The NLRB's decision to defer, and hopefully to eliminate the need for, an administrative balancing of the parties' competing interests by allowing the parties to attempt an accommodation at the bargaining table is vehemently attacked by the unions. This decision, the unions argue, amounts to a refusal to determine whether the employers breached their bargaining obligations by withholding trade secret information. Although such a refusal would violate section 10(c) of the NLRA,[38] our reading of the decisions comports with the one advanced by counsel for the Board. Accordingly, we conclude that the Board *did decide* that the companies had not been shown, on these records, to have violated the Act by failing unconditionally to disclose their trade secrets. The employers had, to be sure, failed to satisfy their bargaining obligations concerning such material. But the NLRB's determination that these violations did not necessitate a full-scale attempt to balance the competing interests on the sparse records before it represents a legitimate and appropriate exercise of the Board's remedial discretion.

Where, as here, requested information is both relevant to a union's representational responsibilities and subject to an employer's legitimate confidentiality interest, the NLRB's reliance, in the first instance, on a longstanding bargaining relationship for the development of an accommodation of these interests does not contravene the Board's statutory obligation to resolve unfair labor practice charges. The unions acknowledge that the NLRB may

**36.** *See Fawcett Printing Corp.,* 201 N.L.R.B. at 975.

**37.** We express no view concerning how the balance between the parties' interests should be struck in the event that no satisfactory conditions can be developed.

**38.** 29 U.S.C. § 160(c) (1976); *see International Union, UAAAIW v. NLRB,* 427 F.2d 1330, 1331–32 (6th Cir.1970).

properly leave to the parties the determination of conditions governing disclosure of information to which it has found a union entitled. *See International Union of Electrical, Radio & Machine Workers v. NLRB,* 648 F.2d at 26; *Ingalls Shipbuilding Corp.,* 143 N.L.R.B. 712, 718 (1963). But they nevertheless contend that, before ordering parties to bargain over the conditions under which confidential information might appropriately be disclosed, the Board must declare unequivocally that the union is entitled to that information—regardless whether conditions sufficiently protective of the employer's legitimate interests can be devised. This contention plainly lacks validity in light of the decision in *Detroit Edison.* These cases may, of course, ultimately come before the Board again for a balancing of the parties' interests. But they will do so on records that will allow a more effective balancing than would those now before us; accordingly, we reject the unions' challenge to the NLRB's orders.

## D. Medical Records

 3M and Colgate both argue that they legitimately withheld certain of the requested information because it involved disclosure of individually identified medical data that would violate employees' rights to privacy and confidentiality. The NLRB recognized that employers may have a legitimate and substantial interest in protecting the confidentiality of employees' medical records,[39] but found that neither Local 6–418 nor Local 5–114 had sought access to individually identified medical records.[40] While we have previously suggested, in the context of discrimination complaints, that the mere deletion of names may not sufficiently ensure employees' confidentiality, *International Union of Electrical, Radio & Machine Workers v. NLRB,* 648 F.2d at 27, the Board's orders in these cases permit the deletion of *any* information that could reasonably be used to identify specific employees. We therefore reject the medical confidentiality defenses asserted by the companies.

## E. Burdensomeness

 The claims of burdensomeness advanced by 3M and Colgate also may be disposed of quickly. While the excessive breadth of a union's request "may in particular circumstances relieve the employer from the obligation to provide some or all of information to which the Union would be entitled on proper demand," [41] the cost and burden of compliance ordinarily will not justify an initial, categorical refusal to supply relevant data. *See International Union of Electrical, Radio & Machine Workers v. NLRB,* 648 F.2d at 26. Issues focused on these factors typically are considered instead at the compliance stage of a disclosure proceeding, where the parties may bargain over the allocation of the costs of producing the requested information. *Safeway Stores,* 252 N.L.R.B. 1323, 1324 (1980), *enforced,* 691 F.2d 953 (10th Cir. 1982).[42] The NLRB adhered to these princi-

---

**39.** *See Johns-Manville Sales Corp.,* 252 N.L.R.B. 368, 368 (1980); *cf. Detroit Edison Co. v. NLRB,* 440 U.S. at 318–19, 99 S.Ct. at 1132–33 (recognizing employer's interest in protecting confidentiality of data bearing on employees' basic competence); *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577–78 (3d Cir.1980) (employees' medical records fall within zone of privacy entitled to protection, but may be subject to disclosure on showing of proper governmental interest).

**40.** There is no merit to the contention that the propriety of a union's continuous request for information must be determined solely from the wording of the initial communication of that request. *See Ohio Power Co.,* 216 N.L.R.B. 987, 990 n. 9 (1975), *enforced mem.,* 531 F.2d 1381 (6th Cir.1976).

**41.** *Fawcett Printing Corp.,* 201 N.L.R.B. at 975 (footnote omitted).

**42.** *See also Food Employer Council,* 197 N.L.R.B. 651, 651 (1972) (footnote omitted):

If there are substantial costs involved in compiling the information in the precise form and at the intervals requested by the Union, the parties must bargain in good faith as to who shall bear such costs, and, if no agreement can be reached, the Union is entitled in any event to access to records from which it can reasonably compile the information.

Notwithstanding Colgate's suggestion to the contrary, we do not read this statement, or the corresponding declarations in the NLRB's opinions in the cases presently under review, to contain any implication that an employer's *con-*

ples in holding that the alleged burdens of compliance did not excuse the companies' refusals to disclose, and we have found no reason to upset its conclusions.

### III. CONCLUSION

We have not attempted to discuss every argument advanced by all of the parties to this proceeding, but we have carefully considered and rejected those not specifically addressed herein. For the reasons set forth above, we enforce in full the Board's orders in each of these cases.

*So ordered.*

*fidentiality* interests ultimately must give way, in all cases, to a union's right of access to relevant information.